UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NATIONAL ELECTRICAL
ANNUITY PLAN,

          Plaintiff,          Case No. 18-13701

v.

                                  Hon. Robert H. Cleland

HENKELS AND MCCOY, INC.,      Mag. Stephanie Dawkins Davis

          Defendant.

_____

## JOINT STATEMENT OF MATERIAL FACTS

### A.    The Parties

1.    Plaintiff National Electrical Annuity Plan ("NEAP") is a trust fund established under, and administered pursuant to, Section 302 of the Labor-Management Relations Act, of 1947, as amended ("LMRA"), 29 U.S.C. §186, and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, et seq., with principal offices located in Rockville, Maryland.   (Am. Compl., PageID.116 at ¶1.)

1

2.      Defendant, Henkels & McCoy, Inc. ("H&M"), is a Pennsylvania corporation, certified to do business in the State of Michigan.  (Ans. to Am. Compl., PageID.269 at ¶2).

## B.      The Teledata Agreement

3.      The IBEW and H&M entered into the Teledata Agreement. ("Teledata Agreement," attached to H&M's Brief at Dkt. 30-2, PageID.368-384, and to NEAP's Brief at 32-3, PageID.535.)

4.      The "Scope" of the Teledata Agreement states that it covers:

low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment, railroad communications, micro waves, V-SAT, by-pass, CATV, WAN (Wide area networks), LAN (local area networks), and ISDN (integrated systems digital network).

(Teledata Agmt., Dkt. 30-2, PageID.368; Dkt. 32-3, PageID.535.)

5.      Section 1.01 of the Teledata Agreement provides:

This Agreement shall take effect March 1, 1995 and shall remain in effect until February 28, 1996, unless otherwise specifically provided for herein.   It shall continue in effect from year to year thereafter, from March 1 through February 28 of each year, unless changed or terminated in the way later provided here.

(Teledata Agmt., Dkt. 30-2, PageID.369; Dkt. 32-3, PageID.536.)

6. Section 1.02(a) of the Teledata Agreement provides:

2

Section 1.02   (a) Either party desiring to change or terminate this Agreement must notify the other, in writing, at least 90 days prior to the anniversary date.

(b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice.

(c)   The existing provisions of the Agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(d)   Notice by either party of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

(Teledata Agmt., Dkt. 30-2, PageID.369; Dkt. 32-3, PageID.536.)

7.     The Teledata Agreement has not been terminated pursuant to Section 1.02, and it therefore remains in effect.

8.     The Teledata Agreement acknowledges that the parties might make changes to the agreement, but expressly states in Section 1.03:

…Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

(Teledata Agmt., Dkt. 30-2, PageID.369; Dkt. 32-3, PageID.536.)

## C.   The 2011 Appendix

9.     H&M has also entered into supplements to the Teledata Agreement with IBEW local unions, namely, Local Union No. 17 ("Local 17") and Local

Union No. 876 ("Local 876").  Together, Local 17 and Local 876 comprise the "Local Unions".

10.    In early 2011, the Local Unions and H&M signed an Appendix to the Teledata Agreement (the "2011 Appendix"). (2011 Appendix, Dkt. 30-9, PageID.421 and Dkt. 32-4, PageID.553.)

11.    The 2011 Appendix is one of several separate documents that modifies the Teledata Agreement for work done within Michigan, a similar process that occurs with respect to other locals nationwide. (Freind 10-11, Dkt. 30-4, PageID.399 and Dkt. 32-2, PageID.524.)

12.    The 2011 Appendix was to be effective from November 29, 2010 through November 27, 2011 and continue on a year-to-year basis unless changed or terminated.   It states as follows:

**EFFECTIVE DATE FOR APPENDIXES**

These Appendixes shall take effect November 29, 2010 and shall remain in effect until November 27, 2011, unless otherwise specifically provided for herein.  It shall continue in effect from year to year thereafter, from November 29 through November 27 of each year unless changed or terminated in the way later provided herein.

(A) Either party desiring to change or terminate these Appendixes must notify the other, in writing, at least 90 days prior to the anniversary date.

(B) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice.

(C)   The existing provisions of the Appendixes shall remain in full force and effect until a conclusion is reached in the matter of proposed changes.

(D)   Notice by either party of a desire to terminate these Appendixes shall be handled in the same manner as a proposed change.

(2011 Appendix, Dkt. 30-9, PageID.421 and Dkt. 32-4, PageID.553.)

13.     Section 5.07 of the 2011 Appendix addresses contributions to NEAP, stating that the Employer will contribute to the NEAP at the rate of 16.5 percent of the gross monthly labor payroll.   (2011 Appendix, Dkt. 30-9, PageID.432 and Dkt. 32-4 at PageID.564).   It also contains provision for a 401(k) plan.   (*Id.* at PageID.431 and 563).

## D.     The 2011 MOU I and 2011 MOU II

14.     A few months after signing the 2011 Appendix, H&M, Local 17, and Local 876 signed two memorandums of understanding.   The first memorandum, which is referred to in the Amended Complaint as "2011 MOU I," (Am. Compl., Dkt. 10, PageID.118 at ¶7) is an addendum to the Agreement, which is defined to include Appendices to the Teledata Agreement "and all successor Agreements." The 2011 MOU I states, in part:

This [MOU], executed between Henkels & McCoy, Inc., hereinafter referred to as "Employer", and IBEW Locals 17 & 876, hereinafter referred to as "Unions", shall serve as an addendum to the Teledata

5

> Agreement, hereafter referred to as the "Agreement", between
> Employer and Union (which Agreement is in the form of Appendices
> to the National Teledata Agreement between Employer and the IBEW
> International), and all successor Agreements...

(2011 MOU I, Dkt. 10-4, PageID.166, *also at* Dkt. 30-10, PageID.443 and Dkt.
32-5, PageID.575.)   The only substantive change to the Agreement contained in
the 2011 MOU I is an increase in the wage rate. (*Id.*) The 2011 MOU I also extends
the "Agreement" three years, or until November 23, 2014.   (*Id.*)

15.    A second memorandum of understanding, referred to in the Amended
Complaint as the "2011 MOU II" (Am. Compl., Dkt. 10, PageID.118 at ¶8) also
serves as an addendum to the Teledata Agreement, its appendices, "and all
successor agreements":

> This [MOU], executed between Henkels & McCoy, Inc., hereinafter
> referred to as "Employer", and IBEW Locals 17 & 876, hereinafter
> referred to as "Union", shall serve as an addendum to the Teledata
> Agreement, hereafter referred to as the "Agreement", between
> Employer and Union (which Agreement is in the form of Appendices
> to the National Teledata Agreement between Employer and the IBEW
> International), and all successor Agreements.

(2011 MOU II, Dkt. 30-11, PageID.444 and Dkt. 32-6, PageID.577). It states that
H&M is not required to make any contributions to the NEAP for "all outside
telephone work":

> It is agreed and understood that for all outside telephone work
> performed by Employer:

6

1) Employer *shall not be required to make any contributions to the National Electrical Annuity Plan.*

2) The wages shall be ninety one per cent (91%) of the wage rates of all classifications contained in the aforementioned Agreements and all successor Agreements.

***

(*Id.* (emphasis added)).   The 2011 MOU II also provided:

4) In the event of any conflict between the provisions of this MOU and the provisions of the aforementioned Agreement, *the provisions of this MOU shall prevail and take precedence*.

(*Id.* (emphasis added)). 2011 MOU II does not contain any durational limitation.

(*Id.*)

16.    The 2011 MOU II was negotiated by Keith Sarns, Business Manager of Local 876, IBEW; Stephen Freind, Vice President and Director of Labor Relations of H&M; and Clint Grassmick, Area Director for the Central Region of H&M.   Although Kevin Shaffer of Local 17, IBEW signed 2011 MOU II, he did not participate in its negotiation. (Shaffer 13-17, Dkt. 30-8, PageID.419 and Dkt. 32-8 at PageID.585; Bradley 19-20, Dkt. 30-3, PageID.387; Freind 18-19, Dkt. 30-4, PageID.400 and Dkt. 32-2, PageID.526; Grassmick 9, Dkt. 30-5, PageID.406 and Dkt. 32-7, PageID.581.)   Sue Gannon from H&M testified that, without going back and looking, she couldn't tell who drafted 2011 MOU II, but stated that "[i]t's

most likely I did, but there are occasions that Steve [Freind] drafted some."
(Gannon 7-8, Dkt. 32-10, PageID.595.)

17.     Steve Freind testified regarding what led to the negotiation of the 2011
MOU II.   He stated that beginning around 1999, the market was facing "nonunion
competition in areas where [H&M] never faced it before." (Freind 20, Dkt. 30-4,
PageID.400 and Dkt. 32-2, PageID.526.) In order to remain an IBEW contractor,
"there were a number of concessions that we needed from the unions," including
removing the provision for NEAP contributions and allowing H&M to pay only
91% of the listed wage rates.   (Freind 20-21, Dkt. 30-4, PageID.400-1 and Dkt.
32-2, PageID.526-7; *see also* Smith Report, Dkt. 30-12, PageID.445.)   Freind
explained that Local 876 did not want to put the NEAP exclusion in the body of the
agreement, but instead agreed to put it in the separate 2011 MOU II. (Freind 21-22,
Dkt. 30-4, PageID.401-2 and Dkt. 32-2, PageID.526-7.)   The 2011 MOU II, in
turn "was amending and being a part of that agreement … and all successor
agreements."   (Freind 22, *Id.*)

18.     Freind could not recall know what projects HM was working on when
2011 MOU II was negotiated.   (Freind 22, *Id.*)

19.     Shaffer testified that he spoke to Keith Sarns of Local 876 who stated
that 2011 MOU II only was intended to apply to landline type of work. (Shaffer

15-17, Dkt. 30-8, PageID.419 and Dkt. 32-8 at PageID.585.)

20.    The term "outside telephone work" is not expressly defined in any of the collectively bargained documents or in any other document. (Freind 23-24, Dkt. 30-4, PageID.401 and Dkt. 32-2, PageID.527; Shaffer 18, Dkt. 30-8, PageID.419 and Dkt. 32-8 at PageID.585; Bradley 37, Dkt. 30-3, PageID.391; Teledata Agreement, Dkt. 30-2, PageID.369 and Dkt. 32-3, PageID.536.)

21.    Grassmick does not recall any discussions during the negotiations for 2011 MOU II regarding what was to be considered "outside telephone work." (Grassmick 9, Dkt.32-7, PageID.581.)

22.    Freind testified that "the general terminology was, outside telephone work is anything, communications performed outside." (Freind 24, 29, Dkt. 30-4, PageID.401, 403 and Dkt. 32-2, PageID.527 and 529).

23.    According to Gary Smith, in his 30 years of experience working in the industry with the IBEW, as well as in his dealings with Local 17 and Local 876, "fiber optic cable placement has always been considered outside telephone work and completed under the Tele-Data agreement."   (Smith Report, Dkt. 30-12, PageID.445; s*ee also* Joynson 27, Dkt. 30-6, PageID.412 ("We have been laying fiber optic cable since the late '80s"); Shaffer 16-17, Dkt. 30-8, PageID.419-420 and Dkt. 32-8, PageID.585-6 (admitting that telephone calls can be transmitted over

fiber optic lines)).

24.    Local 17 and Local 876 are outside locals.   When work is to be done inside a building, it is done by individuals represented by inside IBEW Locals. The work currently being done by H&M for Verizon is outside the building to the demarcation point.   (Joynson 12-13, Dkt. 30-6, PageID.408-409.)

25.    Local 17 Assistant Business Manager Mitchell confirmed that fiber optic lines existed in 2011 and are not "new technology."   (Mitchell 23, Dkt. 30-7, PageID.416).

26.    H&M has used the same general construction methodologies to install fiber optic cables since the 1980s.   (Joynson 28, Dkt. 30-6, PageID.412).   Joynson testified that while the manner in which the client is using the fiber optic cables may have changed, the technology and construction methods H&M has used to install those cables has remained the same.   In other words, H&M was installing a cable in 2011 and a cable in 2018.   (Joynson 11-12, 28, Dkt. 30-6, PageID.408 and 412).

27.    Freind testified that if contributions were made to NEAP for "outside telephone work" after the 2011 MOU II was signed, it was an administrative error. (Freind 28 and 43, Dkt. 30-4, PageID.402 and Dkt. 32-2, PageID.528 and PageID.532.)

10

**E.     The 2014 MOU**

28.     The Local Unions and H&M agreed to extend the 2011-2014 Appendix for two years to November 20, 2016 through another Memorandum of Understanding (the "2014 MOU," Dkt. 32-11, PageID.598.)   The 2014-2016 MOU was signed by H&M on January 9, 2015; by Local 876 on December 16, 2014; and by Local 17 on December 22, 2014. (*Id.*)   The agreement was negotiated between Stephen Freind and Hank Matulewicz of Local 876.   Freind could not recall discussing 2011 MOU II with Hank Matulewicz in 2014.   (Freind 33, Dkt. 30-4, PageID.404 and Dkt. 32-2, PageID.530.)

29.     Although Dean Bradley, Business Manager of Local 17, IBEW, signed the agreement, he did not participate in its negotiations.   (2014 MOU, Dkt. 30-13, PageID.447 and Dkt. 32-11, PageID.598; Freind 32, Dkt. 30-4, PageID.403 and Dkt. 32-2, PageID.529; Bradley 41, Dkt. 30-3, PageID.392.)

**F.     The 2017 Appendix**

30.     In 2017, the Local Unions and H&M signed another Appendix to the Teledata Agreement, which became effective November 21, 2016, but was executed in 2017 (referenced by the parties as the "2016-2018 Appendix" or the "2017 Appendix"). In Section 5.07 of this Appendix, the parties agreed to contribute to NEAP an amount equal to 17% of payroll the first year of the agreement and to

11

18% effective November 24, 2017 of "gross monthly payroll."   (Freind 33-34; Dkt. 30-4, PageID.403 and Dkt. 32-2, PageID.529; 2017 Appx. 12-13, Dkt. 30-14, PageID.459-460 and Dkt. 32-12, PageID.611-612.)

31.   The 2017 Appendix was effective "until November 25, 2018, unless otherwise specifically provided herein."   (2017 Appx at 1, Dkt. 30-14, PageID.448; Dkt. 32-12, PageID.600.)   The 2017 Appendix automatically renews unless a party seeking to modify or terminate the Appendix provides timely, detailed notice regarding the nature of the changes desired.   (*Id*.)

32.   The 2017 Appendix does not mention the 2011 MOU II.   (*See id.*)

33.   The 2017 Appendix does not contain an integration clause purporting to supersede prior agreements.   The 2011 MOU II was not even discussed during negotiations. (Bradley 43-45, Dkt. 30-3, PageID.392 and Dkt. 32-9, PageID.590; Freind 35-36, Dkt. 30-4, PageID.403 and Dkt. 32-2, PageID.530 (stating he could not recall if it was discussed).)

34.   Although the 2017 Appendix was signed by Chad Clark for Local 876 and Dean Bradley for Local 17, Stephen Freind, neither participated in the negotiations.   (Freind 34-35, Dkt. 30-4, PageID.403 and Dkt. 32-2, PageID.530; Bradley 42, Dkt. 30-3, PageID.392 and Dkt. 32-9, PageID.590.)

**G.     Additional Facts Regarding Bargaining History**

35.     In January, 2018, the parties negotiated and signed two Memorandum of Understandings, dealing with the issues of portability and jurisdiction of the Local Unions over Verizon work, which were addendums to the 2016-2018 Teledata Agreement.   Local 17 Assistant Business Manager Mitchell did not participate in the negotiation of the 2018 MOUs.   He testified that in order for either party to eliminate these MOUs, that party would have to negotiate for the elimination of the MOU:

> Q.     Now if a party wanted to eliminate one of these MOUs, what would they have to do?
> A.     You would have to negotiate it out.

(Mitchell 28, Dkt. 30-7, PageID.417.)

36.     Local 17 Business Manager Dean Bradley testified that it was Local 17's practice to put proposals to eliminate provisions of contracts in writing:

> Q.     What is Local 17's practice with respect to proposals; is it provided in writing, orally?
> A.     Typically in writing.
> Q.     So if someone wants to add something to a contract, would they normally provide a proposal in writing, you know, we want to add no subcontracting language or something like that; you'd put that in writing?
> A.     Typically, yes.
> Q.     How about if you were going to remove something from a contract; would you put a proposal to remove certain language from a contract in writing?
> A.     Typically, yes.

13

(Bradley 23, Dkt. 30-3, PageID.388).

37.    Bradley also testified that a party seeking to modify a collectively bargained provision must provide at least 90 notice prior to the anniversary date of the contract.   (Bradley 29, Dkt. 30-3, PageID.390).   Bradley stated that Local 17's practice is to send letters regarding its intent to negotiate changes to the bargaining agreements.   (Bradley 29, Dkt. 30-3, PageID.390).

38.    Since 2011, Local 17 has never submitted a letter of intent to modify the collectively bargained documents. (Bradley 31, Dkt. 30-3, PageID.390). Instead, each time such a letter was sent, it was sent by Local 876.   (8/25/11 letter, Dkt. 30-15, PageID.470; 8/20/14 letter, Dkt. 30-16, PageID.471; 8/27/18 letter, Dkt. 30-17, PageID.472.).

39.    Neither Local Union has ever sent a proposal to amend, modify, or terminate the 2011 MOU II.   (*Id., and see, e.g.,* Bradley 38-40, 43, Dkt. 30-3, PageID.391-2 and Dkt. 32-9, PageID.589; Shaffer 18-20, Dkt. 30-8, PageID.420 and Dkt. 32-8, PageID.586.)   Local 17 Business Manager Bradley confirmed that prior to negotiating the current appendix, the unions **did not** send a notice of intent to modify, amend, or terminate the 2011 MOU II and that it was not even discussed during negotiations.   (Bradley 43-45, Dkt. 30-3, PageID.392 and Dkt. 32-9,

14

PageID.590.)

40.     According to Gary Smith, the "NEAP's position or statement that the MOU II has not been in effect since, at the latest, November 21, 2016 when a new Appendix was signed, violates the Union's very own long standing position that no agreement or part of an agreement expires or is canceled unless in writing and approved by all parties." (Smith Report, Dkt. 30-12, PageID.445.)

**H.     Recent Events**

41.     Mitchell and Bradley testified that they were not personally aware of the existence of 2011 MOU II prior to October 2018. (Mitchell 12, Dkt. 30-7, PageID.414; Bradley 54-57, 61-62, Dkt. 30-3, PageID.395-397). Both assert that the first time they had personal knowledge of the 2011 MOU II was when they received a copy from H&M in October 2018.  (10/2018 email chain, Dkt. 30-18, PageID.473-4).

42.     After Bradley and Mitchell became aware of the 2011 MOU II, on October 31, 2018, they contacted counsel and drafted a letter stating their position that the 2011 MOU II was no longer in effect.  (10/31/18 letter, Dkt. 30-19, PageID.475; Bradley 58-60, Dkt. 30-3, PageID.396).  Bradley admitted that this letter was not sent 90 days prior to the anniversary date of the contracts.  (Bradley 39-40, 61-62, Dkt. 30-3, PageID.391, 397).

43.    Freind, who negotiated each collectively bargained agreement between H&M and Locals 17 and 876, including the 2011 MOU II, responded.   Freind explained that Bradley's belief about the MOU was not correct since it applied to "all successor agreements."   (10/31/18 email, Dkt. 30-20, PageID.477).

44.    On November 27, 2018, Plaintiff filed this lawsuit.   On January 16, 2019, H&M filed a motion to dismiss.

45.    On January 22, 2019, the Local Unions sent a letter regarding termination of 2011 MOU II.   (1/22/19 letter, Dkt. 30-21, PageID.478). On May 22, 2019, H&M responded, explaining in detail why the 2011 MOU II remains in effect.   (5/22/19 letter, Dkt. 30-22, PageID.480).

46.    Bradley and Mitchell confirmed that Local 17 maintained copies of the 2011 MOU II in its files. (Mitchell 12, Dkt. 30-7, PageID.414; Bradley 9-10, Dkt. 30-3, PageID.386 (acknowledging that he relies on Mitchell to know what is in the CBAs), 52, PageID.394 (stating he probably told Mitchell to review the collective bargaining history)). Mitchell testified that while he "sometimes" reviews the relevant collectively bargained documents prior to negotiations, with respect to negotiations with H&M he "didn't go backwards to see what they did in the past." (Mitchell 12-13, Dkt. 30-7, PageID.414).

47.    Mitchell initially testified that he only personally had "the last five

16

years of files" related to H&M and that older files were "in storage." (Mitchell 14, Dkt. 30-7, PageID.415).   Mitchell later admitted that "storage" meant that the files were on a different floor in Local 17's headquarters.   (Mitchell 15-16, Dkt. 30-7, PageID.415).   It took him a half hour to find a copy of the 2011 MOU II in Local 17's files once he went to look for it in response to a subpoena served in this lawsuit.   (Mitchell 16, Dkt. 30-7, PageID.415)

## G.   Complaint Allegations

48.   According to Plaintiff, the work that H&M is performing is "the installation of a 5G network … in various locations within the geographic jurisdiction of Local 17, which includes the installation of MCI small cell equipment and overhead and underground fiber."   (Am. Comp., ¶12, Dkt. 10, PageId.119-120). This work, which is for Verizon, is also described as consisting of over 1,500 miles "of aerial and underground fiber optic cable and conduit construction." (Joynson 9-10, Dkt. 30-6, PageID.408; 5/2018 email chain at 2, Dkt. 30-23, PageId.482**)**.   Director of Central Telecom Jon Joynson, who oversees the project, explained that H&M installs the cable up to a demarcation point, and that all of the work performed is "outside the building."[1] (Joynson 10-12, Dkt. 30-6, PageID.408).   Joynson explained that when H&M bid on the Verizon project, it

17

did so with the understanding that the 2011 MOU II and its associated cost structure, remained in effect. (Joynson 14-18, Dkt. 30-6, PageID.409-410.).

## H.   Damages

### 1.   *Plaintiff's Factual Statements Regarding Damages*

49.   Plaintiff's Auditor, Charles D. Nichols, determined that from November, 2016 through July, 2019, HM would owe a total of $357,485.83 in contributions to NEAP for work performed under the Teledata Agreement, if the Court were to rule in Plaintiff's favor.   He determined this amount by applying the appropriate contribution rate to NEAP to the payroll documents furnished to plaintiff by HM during the course of discovery of employees on whose behalf HM had not made contributions to NEAP.   (Deposition of Charles Nichols, at 15, Dep. Ex. 23; Supplemental Affidavit of Charles Nichols,¶ 2).   As noted in Paragraph 51, Defendant does not concede the accuracy of Nichols' determination.

50.   Based upon a review of the contribution records of NEBF and records provided by HM (Defendant's 4th Supplemental Response to Plaintiff's First Request for Production of Documents; Henkels NEAP0002100 - 0002169), Charles Nichols determined that between 2012 and 2016, HM contributed $544,834.19 to NEAP for work it considered to be outside telephone work performed under the

---

[1] If the demarcation point is inside the building, a small amount of work may occur inside the structure.   (Joynson 12, Dkt.30-6, PageID.408).

Teledata Agreement within the geographic jurisdiction of Local 17 and Local 876. During this same time period, HM performed work that it classified as outside telephone work on which it did not contribute a total of $19,066.17 in contributions. This work was performed basically on one project, identified as General Dynamics Cell Tower.   (Supplemental Affidavit of Charles Nichols, ¶3)   Defendant does not concede the accuracy of Mr. Nichols' determination.   It also contends that any contributions made for what it considered to be outside telephone work was an administrative error.

### 2.   *Defendants' Factual Statements Regarding Damages*

51.   Although Nicholls purported to calculate the amount of contributions owed, he admitted that he was uncertain about the scope of damages.   Specifically, Nichols admitted that he did not review any of the applicable collective bargaining agreements, but instead relied solely on the representation of Plaintiff's counsel for the applicable rate and was directed to apply it to all payroll entries that had not had a NEAP contribution. (H&M Response Brief Ex 25, Nichols at 12, 21.) He agreed that this was not a "typical audit." (*Id.*, Nichols 14.) He did not review the types of work employees were performing. (*Id.*, Nichols 21.) He did not know if NEAP contributions were required to be made for all types of work, did not know if different rates applied to different types of work, and did not even know the

different types of work being performed. (*Id*.) He also did not know if H&M

mistakenly contributed for certain work that it was not required to contribute (such

that any potential contributions would be subject to an offset).

/s/George H. Kruszewski (w/ consent)
WATKINS, PAWLICK, CALATI, &
PRIFTI, PC
*Attorneys for Plaintiff*
1423 Easts Twelve Mile Road
Madison Heights, MI 48071
(248) 658-0800
gkruszewski@wpcplaw.com

Dated:   November 8, 2019

/s/Brian M. Schwartz
MILLER, CANFIELD, PADDOCK
   AND STONE, PLC
*Attorney for Defendant*
150 West Jefferson, Suite 2500
Detroit, MI 48226
(313) 963-6420
schwartzb@millercanfield.com

Dated:   November 8, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

/s/Brian M. Schwartz (P69018)
Miller, Canfield, Paddock and Stone, P.L.C.
*Attorneys for Defendant*
150 West Jefferson, Suite 2500
Detroit, Michigan   48226
(313) 963-6420
schwartb@millercanfield.com
P69018

34749074.6\154842-00002

21