**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

NATIONAL ELECTRICAL ANNUITY PLAN,

     Plaintiff,

v.                                    Case No. 18-13701

HENKELS AND MCCOY, INC.,

     Defendant.

                                        /

**OPINION AND ORDER DENYING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In an amended complaint filed January 31, 2019, Plaintiff National Electrical Annuity Plan ("NEAP") alleges that Defendant Henkels and McCoy, Inc. ("H&M") failed to make required Employee Retirement Income Security Act ("ERISA") contributions pursuant to the terms of the parties' collective bargaining agreement. NEAP requests contributions for work performed for Verizon related to the installation of equipment and fibers to support a 5G network. The parties filed cross motions for summary judgment on the issue of whether the relevant collective bargaining documents obligate H&M to make contributions for work performed on the Verizon project. The motions have been briefed, and the court concludes that a hearing is not necessary. *See* E.D. Mich. 7.1(f)(2). For the reasons stated below, the court will deny NEAP's motion for summary judgment and will grant H&M's motion.

# I. BACKGROUND

The court draws the following facts from the parties' Joint Statement of Material

Facts. (Joint Statement ECF No. 36.)[1]

## A. The Agreement

In 1995, the International Brotherhood of Electrical Workers ("IBEW") entered

into an agreement ("the Agreement") with H&M to perform "teledata" work across the

United States. The scope of the Agreement covers:

> low voltage construction, installation, maintenance and removal of teledata
> facilities (voice, data and video) including outside plant, telephone and
> data inside wire, interconnect, terminal equipment, central offices, PABX,
> fiber optic cable and equipment, railroad communications, micro waves, V-
> SAT, by-pass, CATV, WAN (Wide area networks), LAN (local area
> networks), and ISDN (integrated systems digital network).

The Agreement specifically describes the process for terminating or amending any

portion of the Agreement. Section 1.02 describes the process for termination:

> (a) Either party desiring to change or terminate this Agreement must notify
> the other, in writing, at least 90 days prior to the anniversary date.
>
> (b) Whenever notice is given for changes, the nature of the changes
> desired must be specified in the notice.
>
> (c) The existing provisions of the Agreement shall remain in full
> force and effect until a conclusion is reached in the matter of proposed
> changes.
>
> (d) Notice by either party of a desire to terminate this Agreement
> shall be handled in the same manner as a proposed change.

Additionally, Section 1.03 requires that changes to the Agreement be in writing:

> Any such change or supplement agreed upon shall be reduced to writing,
> signed by the parties hereto, and submitted to the International Office of
> the IBEW for approval, the same as this Agreement.

---

[1] For ease of readability, the court cites to the numbered factual paragraphs of
the Joint Statement and omits internal citations.

(Joint Statement ¶¶ 3–8.)

## B. The 2011 Appendix

H&M entered into supplements to the Agreement with IBEW local unions,

namely, Local Union No. 17 ("Local 17") and Local Union No. 876 ("Local 876").

Together, Local 17 and Local 876 comprise the "Local Unions". (Joint Statement

¶ 9.)

In early 2011, the Local Unions and H&M signed an Appendix to the

Agreement (the "2011 Appendix"). The 2011 Appendix is one of several separate

documents modifying the Agreement for work done within Michigan. The original

term of the 2011 Appendix lasted from November 29, 2010, through November

27, 2011, and continued on a year-to-year basis unless changed or terminated.

The 2011 Appendix contained its own requirements for terminating or amending

the 2011 Appendix:

> (A) Either party desiring to change or terminate these Appendixes must
> notify the other, in writing, at least 90 days prior to the anniversary date.

> (B) Whenever notice is given for changes, the nature of the changes
> desired must be specified in the notice.

> (C) The existing provisions of the Appendixes shall remain in full
> force and effect until a conclusion is reached in the matter of
> proposed changes.

> (D) Notice by either party of a desire to terminate these Appendixes
> shall be handled in the same manner as a proposed change.

The 2011 Appendix also provided for contributions to NEAP at a rate of 16.5 % of

the gross monthly labor payroll and provisions for a 401(k) plan. (Joint Statement

¶¶ 10–13.)

## C. The 2011 MOU I and 2011 MOU II

The parties signed two Memoranda of Understanding after signing the 2011 Appendix. The first ("2011 MOU I") is an addendum to the Agreement and all successor agreements. The only substantive change to the Agreement contained in the 2011 MOU I is an increase in the wage rate. The 2011 MOU I also extends the Agreement by three years, or until November 23, 2014.

The second memorandum of understanding ("2011 MOU II") also serves as an addendum to the Agreement and all successor agreements. In relevant part, the 2011 MOU II states that H&M is not required to make any contributions to NEAP for "outside telephone work." The 2011 MOU II does not contain any durational language and states that "in the event of any conflict between the provisions of this MOU and the provisions of the aforementioned Agreement, the provisions of this MOU shall prevail and take precedence." (Joint Statement ¶¶ 14–15.)

Keith Sarns, Business Manager of Local 876, IBEW; Stephen Freind, Vice President and Director of Labor Relations of H&M; and Clint Grassmick, Area Director for the Central Region of H&M, negotiated the 2011 MOU II. Although Kevin Shaffer of Local 17 IBEW signed the 2011 MOU II, he did not participate in its negotiation. Sue Gannon from H&M testified that she "most likely" drafted the 2011 MOU II but that Steve Freind may have also drafted it. (Joint Statement ¶ 16.)

Freind testified about the lead up to the negotiations for the 2011 MOU II. He stated that beginning around 1999, the market faced "nonunion competition in areas where [H&M] never faced it before." In order to remain an IBEW contractor,

"there were a number of concessions that we needed from the unions," including

removing the provision for NEAP contributions and allowing H&M to pay only

91% of the listed wage rates. Freind explained that Local 876 did not want to put

the NEAP exclusion in the body of the agreement, but instead agreed to put it in

the separate 2011 MOU II. The 2011 MOU II, in turn "was amending and being a

part of that agreement . . . and all successor agreements." Freind could not recall

what projects H&M worked on when at the time of negotiations for the 2011 MOU

II. (Joint Statement ¶¶ 17–18.)

Shaffer testified that he spoke to Sarns of Local 876 who stated that 2011

MOU II was intended to apply only to landline type of work. (Joint Statement ¶

19.)

**1. Defining "Outside Telephone Work"**

The term "outside telephone work" is not defined in any of the collectively

bargained documents. Area Director for the Central Region of H&M Grassmick does not

recall any discussions during the negotiations for the 2011 MOU II regarding what type

of work constituted "outside telephone work." Freind testified that "the general

terminology was, outside telephone work is anything, communications performed

outside." According to Gary Smith, in his 30 years of experience working in the industry

with the IBEW, as well as in his dealings with Local 17 and Local 876, "fiber optic cable

placement has always been considered outside telephone work and completed under

the Tele-Data agreement." (Joint Statement ¶¶ 20–23.)

Local 17 and Local 876 are outside locals. Inside IBEW Locals complete work

inside of buildings. The work currently being done by H&M for Verizon occurs outside

the building to the demarcation point. Local 17 Assistant Business Manager Jeff Mitchell confirmed that fiber optic lines existed in 2011 and are not "new technology." H&M has used the same general construction methodologies to install fiber optic cables since the 1980s. Director of Central Telecom Jon Joynson, who oversees the Verizon project, testified that while the manner in which the client uses the fiber optic cables may have changed, the technology and construction methods used by H&M to install those cables have remained the same. (Joint Statement ¶¶ 24–26.)

Freind testified that any contributions made to NEAP for outside telephone work after the parties signed the 2011 MOU II were made in administrative error. (Joint Statement ¶ 27.)

### D. The 2014 MOU

The Local Unions and H&M agreed to extend the 2011-2014 Appendix for two years to November 20, 2016, through another Memorandum of Understanding (the "2014 MOU".) H&M signed the 2014 MOU on January 9, 2015; Local 876 signed on December 16, 2014; and Local 17 signed on December 22, 2014. Freind and Hank Matulewicz of Local 876 negotiated the 2014 MOU. Freind could not recall discussing 2011 MOU II with Matulewicz in 2014. Although Dean Bradley, Business Manager of Local 17, IBEW, signed the agreement, he did not participate in its negotiation. (Joint Statement ¶¶ 28–29.)

### E. The 2017 Appendix

In 2017, the Local Unions and H&M signed another Appendix to the Agreement. The 2017 Appendix became effective on November 21, 2016, but was executed in 2017. (Joint Statement ¶ 30.)

In section 5.07 of the 2017 Appendix, the parties agreed to contribute to NEAP an amount equal to 17% of payroll the first year of the agreement and 18% of "gross monthly payroll" effective November 24, 2017. The 2017 Appendix contained no restrictions limiting contributions for "outside telephone work." The 2017 Appendix was effective "until November 25, 2018, unless otherwise specifically provided herein," but automatically renews unless a party requests to modify or terminate the 2017 Appendix and provides timely, detailed notice regarding the nature of the desired changes. The 2017 Appendix does not mention the 2011 MOU II and does not contain an integration clause purporting to supersede prior agreements. The parties did not discuss the 2011 MOU II during negotiations. Chad Clark for Local 876 and Dean Bradley for Local 17 signed the 2017 Appendix but neither participated in its negotiations. (Joint Statement ¶¶ 30–34.)

### F. Additional Facts Regarding Bargaining History

In January 2018, the parties negotiated and signed two Memoranda of Understanding addressing the issues of portability and jurisdiction of the Local Unions over the Verizon work. These MOUs served as addenda to the 2017 Appendix. Local 17 Assistant Business Manager Mitchell did not participate in the negotiation of the 2018 MOUs. He testified that in order for either party to eliminate these MOUs, the party must negotiate such elimination. (Joint Statement ¶ 35.) Local 17 Business Manager Dean Bradley testified that it was the practice of Local 17 to put in writing proposals to eliminate provisions of contracts. (Joint Statement ¶ 36.) Bradley also testified that a party seeking to modify a collectively bargained provision must provide at least 90 days notice prior to the anniversary date of the contract and that Local 17 traditionally sent

letters regarding its intent to negotiate changes to the bargaining agreements. (Joint

Statement ¶ 37.)

No Local Union has ever sent a proposal to amend, modify, or terminate the

2011 MOU II. Local 17 Business Manager Bradley confirmed that prior to negotiating

the current appendix, the Local Unions did not send a notice of intent to modify, amend,

or terminate the 2011 MOU II and that the parties did not discuss the 2011 MOU II

during negotiations. According to Gary Smith, the "NEAP's position or statement that

the MOU II has not been in effect since, at the latest, November 21, 2016, when a new

Appendix was signed, violates the Union's very own long standing position that no

agreement or part of an agreement expires or is canceled unless in writing and

approved by all parties." (Joint Statement ¶¶ 38–40.)

**G. Recent Events**

Mitchell and Bradley testified that they were not personally aware of the

existence of the 2011 MOU II prior to October 2018. Both assert that they first learned

of the 2011 MOU II after receiving a copy from H&M in October 2018. After receiving

copies of the 2011 MOU II, Bradley and Mitchell contacted counsel and drafted a

position letter stating that the 2011 MOU II was no longer in effect. Bradley admitted

that this letter was not sent 90 days prior to the anniversary date of the contracts.

Freind, who negotiated each collectively bargained agreement between H&M and the

Locals Unions, including the 2011 MOU II, responded to Bradley's letter and explained

that the 2011 MOU II remained in effect because it applied to "all successor

agreements." (Joint Statement ¶¶ 41–43.)

On November 27, 2018, NEAP filed this lawsuit. After H&M filed its motion to dismiss, the Local Unions sent a letter regarding the termination of the 2011 MOU II. H&M responded to the letter in May 2019 and explained why the 2011 MOU II remains in effect. Bradley and Mitchell confirmed that Local 17 maintained copies of the 2011 MOU II in its files. Mitchell testified that while he "sometimes" reviews the relevant collectively bargained documents prior to negotiations, with respect to negotiations with H&M he "didn't go backwards to see what they did in the past." Mitchell initially testified that he personally kept only "the last five years of files" related to H&M and that older files were "in storage." Mitchell later admitted that Local 17 stores its files on a different floor of its headquarters and that it took him 30 minutes to find a copy of the 2011 MOU II in Local 17's files once he looked for it. (Joint Statement ¶¶ 44–47.)

## H. Complaint Allegations

According to NEAP, the work performed by H&M includes "the installation of a 5G network . . . in various locations within the geographic jurisdiction of Local 17, which includes the installation of MCI small cell equipment and overhead and underground fiber." This work, completed for Verizon, consists of installing over 1,500 miles "of aerial and underground fiber optic cable and conduit construction." Director of Central Telecom Jon Joynson—who oversees the project—explained that H&M installs the cable up to a demarcation point and that all of the work performed occurs "outside the building." Joynson also explained that when H&M bid on the Verizon project, it did so with the understanding that the 2011 MOU II and its associated cost structure remained in effect. (Joint Statement ¶ 48.) Additionally, Joynson testified that when he bid on the

Verizon project, he assumed that the work involved outside telephone work. (ECF No. 30-6, PageID.409.)

In addition to disputing H&M's obligation to make contributions, the parties also dispute the amount and methodology for NEAP's damage calculation. (Joint Statement ¶¶ 49–51.)

## II. STANDARD

Summary judgment is appropriate when there exists no dispute of material fact and the moving party demonstrates entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers all evidence, and all reasonable inferences flowing therefrom, in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). The court may not make credibility determinations or weigh the evidence presented in support or opposition to a motion for summary judgment, only the finder of fact can make such determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

The movant has the initial burden of showing—pointing out—the absence of a genuine dispute as to any material fact; i.e., "an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). The burden then shifts to the nonmoving party to set forth enough admissible evidence to raise a genuine issue of material fact for trial. *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248; *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017). Not all

factual disputes are material. A fact is "material" for purposes of summary judgment

when proof of that fact would establish or refute an essential element of the claim "and

would affect the application of the governing law to the rights of the parties." *Rachells v.*

*Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013).

### III. ANALYSIS

Ordinary principles of contract law govern collective bargaining agreements. *See*

*M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (citing *Textile Workers*

*v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957)). Courts look "first to the [collective

bargaining agreement's] explicit language for clear manifestations of the parties' intent,"

and interpret the agreement as "'part of an integrated whole' meaning that, wherever

possible, 'each provision is construed consistently with the entire document and the

relative positions and purposes of the parties.'" *Id.* (quoting *Int'l Union v. Yard-Man*, 716

F.2d 1476, 1479 (6th Cir. 1983)).

The parties' cross motions turn on essentially two issues of contract

interpretation: (1) whether the 2011 MOU II limiting contributions for "outside telephone

work" remains in effect and (2) whether the work for which NEAP seeks contribution

constitutes outside telephone work within the meaning of the 2011 MOU II. The court

will address each of these issues in turn.

### A. Whether the 2011 MOU II Remains in Effect

NEAP offers several arguments in support of its position that the 2011 MOU II is

no longer in effect. As explained below, none of NEAP's arguments find support in law

or the facts of this case.

11

First, NEAP argues that because the 2017 Appendix did not limit contributions for

outside telephone work, the 2017 Appendix obligated H&M to contribute for *all* work

performed under the Agreement. (ECF No. 31, PageID.503.) H&M responds that the

2017 Appendix's failure to specify the type of work it covers is of no consequence

because neither party ever attempted to terminate the 2011 MOU II. (ECF No. 35,

PageID.362.) The Agreement requires that a party seeking to modify or terminate a

term must submit a written request at least 90 days before the anniversary date of the

Agreement. (Joint Statement ¶¶ 3–8.) The parties agree that neither H&M or NEAP

requested to terminate or modify the 2011 MOU II prior to this lawsuit. (Joint Statement

¶¶ 38–40.) Therefore, argues H&M, the 2011 MOU II remains in effect based on the

plain language of the Agreement. (ECF No. 35, PageID.633.) NEAP responds that the

2011 MOU II cannot continue in perpetuity simply because it does not contain a

termination clause. (ECF No. 31, PageID.504.) But as H&M correctly explains (ECF No.

30, PageID.356), the absence of a termination clause in the 2011 MOU II means that

the durational limits of the Agreement govern the 2011 MOU II. *See Gallo v. Moen Inc.*,

813 F.3d 265, 271–72 (6th Cir. 2016) ("The CBAs' general durational clauses provide a

baseline or default rule, a point at which the agreements expire absent more specific

limits relevant to a particular term.").[2] Here, the plain terms of the Agreement and the

---

[2] NEAP's related argument regarding the availability of certain contract defenses
to H&M under § 515 of ERISA is misplaced. (ECF No. 31, PageID.511.) Here, H&M
disputes its obligation to make contributions for certain work. Such argument is
permissible because, as the Sixth Circuit has explained, "employee benefit funds 'are
not entitled to enforce a nonexistent contractual obligation.'" *Plumbers & Pipefitters
Local Union No. 572 Health & Welfare Fund v. A & H Mech. Contractors*, 100 F. App'x
396, 402 (6th Cir. 2004) (quoting *Devito v. Hempstead China Shop, Inc.*, 38 F.3d 651,
654 (2d Cir. 1994)). Therefore, H&M can argue whether it has a contractual oblation to
make the contributions requested by NEAP.

2011 MOU II require the parties to submit written requests for modification or

termination. The parties agree that neither side submitted any request to terminate or

modify the 2011 MOU II; therefore, the 2011 MOU II remains in effect.

Second, NEAP argues that its representatives were not aware of the 2011 MOU

II when they negotiated subsequent agreements. (ECF No. 31, PageID.504.) However,

as H&M observes, the representatives' lack of familiarity with or knowledge of the 2011

MOU II does not impact the lasting effects of the properly executed agreement. (Joint

Statement ¶¶ 14–16.) A basic principle of contract law is that contracts can be enforced

against parties and their agents even when the signing party fails to read the complete

terms of the contract before execution. *See Rory v. Continental Ins. Co.*, 703 N.W.2d

23, 42 n. 82 (Mich. 2005) (explaining that "an insured's failure to read his or her

insurance contract has never been considered a valid defense"); *Mich. Elec. Emp.*

*Pension Fund v. Encompass Elec. & Data Inc.*, 556 F.Supp.2d 746, 760 (W.D. Mich.

2008) ("Michigan common law obligated [defendant's agent] to read the letters of

assent *and* the incorporated CBAs before signing; if he did not, he and [defendant] are

nonetheless charged with knowledge of the CBAs' terms and are bound by them.").

NEAP's failure to familiarize itself with the 2011 MOU II before negotiating subsequent

agreements is not a legitimate reason to avoid enforcement of the lasting terms of the

2011 MOU II.

Third, NEAP argues that the parties' intent to terminate the 2011 MOU II can be

"implied" from the fact that the 2011 MOU II was not attached to subsequent

amendments to the Agreement and that subsequent amendments contained "no

exclusion for the obligation to contribute to NEAP for any type of work." (ECF No. 31,

13

PageID.505–06.) In support of this argument, NEAP points to the principle that a

contract containing a term inconsistent with a prior contract between the same parties

rescinds the earlier agreement. (*Id.* at 506.) H&M responds that NEAP's argument

regarding "implicit repeal" is "pure speculation." (ECF No. 35, PageID.637–38.) H&M

correctly explains that when a subsequent contract contains no integration clause—

such as the 2017 Appendix in this case—the subsequent contract supersedes the first

contract "if the later contract covers the same subject matter as the earlier contract and

contains terms that are inconsistent with the terms of the earlier contract." *Archambo v.

Lawyers Title Ins. Co.*, 646 N.W.2d 170, 177 n.16 (Mich. 2002) (citing *Joseph v.

Rottschafer*, 227 N.W. 784 (Mich. 1929)). "If, however, it appears that there was no

intent to abrogate the first contract, the rule does not apply." *Joseph*, 227 N.W. at 786.

Additionally, the parties' intentions regarding abrogation must be "gleaned from both

documents." *Omnicom of Mich. v. Giannetti Inv. Co.*, 561 N.W.2d 138 (Mich. Ct. App.

1997) (citing *Culver v. Castro*, 338 N.W.2d 232 (Mich. Ct. App. 1983). Where the

second agreement does not completely cover the subject matter of the first, the

contested provisions contained in the first agreement remain in effect. *Id.*

The terms of the 2011 MOU II are not inconsistent with the 2017 Appendix. The

2011 MOU II specifically prohibits contributions for "outside telephone work" whereas

the 2017 Appendix contains no explicit limitation on the type of work for which H&M

must contribute. (ECF No. 30-11; ECF No. 30-14.) The silence of the 2017 Appendix on

the type of work eligible for contributions is an omission, not an inconsistency because

the two agreements can still "stand together." *Joseph*, 227 N.W. at 786. The 2017

Appendix leaves undisturbed the 2011 MOU II's limitations on contributions for outside

telephone work. The 2011 MOU II limits the type of work for which H&M must contribute while the 2017 Appendix alters the rates paid for eligible contributions—these terms are not inconsistent.

Even assuming, *arguendo*, that the 2011 MOU II and the 2017 Appendix were inconsistent, the evidence does not demonstrate the parties' "intent to abrogate the first contract." *Joseph*, 227 N.W. at 786. NEAP admits that it made no request to revoke or modify the 2011 MOU II. (Joint Statement ¶¶ 38–40.) Furthermore, NEAP states that there "is no evidence" its agents who signed the 2017 Appendix "were even aware of the existence of the 2011 MOU II." (ECF No. 31, PageID.504–05.) NEAP's agents could not intend to revoke an agreement they did not know existed.

In summary, the 2011 MOU II remains in effect based on the failure of the parties to terminate or modify it pursuant to the terms of the Agreement. Additionally, the plain language of the 2017 Appendix does not rescind the 2011 MOU II's limitation on contributions for outside telephone work, nor does the evidence suggest that the parties intended to terminate the 2011 MOU II.

The court now turns to the remaining question of whether the work performed constitutes "outside telephone work."

### B. Whether the Work Constitutes "Outside Telephone Work"

NEAP seeks contribution for work related to the installation of a 5G network for Verizon, "which includes the installation of MCI small cell equipment and overhead and underground fiber." (ECF No. 10, PageID.120.) Specifically, the Verizon project consists of installing over 1,500 miles "of aerial and underground fiber optic cable and conduit construction." (Joint Statement ¶ 48.) Pursuant to the 2011 MOU II, H&M is not required

to contribute to NEAP for "outside telephone work," but neither the 2011 MOU II or any of the collective bargaining documents define the term "outside telephone work." (Joint Statement ¶¶ 20–23.)

"A contract or term is ambiguous if it is reasonably susceptible to more than one meaning." *Wonderland Shopping Ctr. Venture L.P v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1095 (6th Cir. 2001) (citing *Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 314 N.W.2d 440, 441 (Mich. 1982). "Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity . . . to indicate the actual intent of the parties where an actual ambiguity exists." *Id.* (citing *Am. Anodco, Inc. v. Reynolds Metals Co.*, 743 F.2d 417, 422 (6th Cir. 1984)). The Michigan Supreme Court has explained that "'[t]he practical interpretation given to contracts by the parties to them, while engaged in their performance and before any controversy has arisen concerning them, is one of the best indications of their true intent.'" *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 459 (Mich. 2003) (quoting *People v. Mich. Ctrl. R. Co.*, 108 NW 772 (Mich. 1906)). Parties can introduce parol evidence to demonstrate their intent and clarify ambiguities, but such evidence must still be admissible for the court to consider it at the summary judgment stage. *See Gilleland v. Schanhals*, 55 F. App'x 257, 261–62 (6th Cir. 2003).

NEAP contends that H&M owes it $357,485.83 for work on the Verizon project. (ECF No. 31, PageID.500; ECF No. 32-1, PageID.519.) NEAP admits that the Verizon project is "outside" work but argues that the work is not "telephone" work. (ECF No. 31, PageID.498; ECF No. 37, PageID.844.) NEAP's basis for this argument is not entirely clear.

In the factual statement section of its motion, NEAP states that Kevin Shaffer of Local 17, who did not negotiate the 2011 MOU II, was informed by Keith Sarns of Local 867 that the 2011 MOU II's restrictions on contributions for outside telephone work "only was intended to apply to landline type of work." (ECF No. 31, PageID.497.) It appears that NEAP means to imply that the Verizon project is not landline work. To the extent NEAP seeks to pursue such an argument, Shaffer's testimony constitutes hearsay and cannot be used to defeat a properly supported motion for summary judgment. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

NEAP's only other discernable argument is that the Verizon project is not outside telephone work because records purport to show that H&M contributed over $540,000 to NEAP since 2011 for work classified as "outside telephone work." (ECF No. 31, PageID.508; ECF No. 38, PageID.845.) H&M responds that payroll errors "occasionally result in the remittance of NEAP contributions" for outside telephone work, but that these errors form no legal basis for contribution. (ECF No. 30, PageID.362.) Even assuming that H&M made contributions for outside telephone work in the past, "merely identifying words or actions inconsistent with a contract term does not constitute waiver unless 'unequivocal' and contrary to 'any other intent.'" *FCA US LLC v. Eagle Auto-Mall Corp.*, 702 F. App'x 301, 304 (6th Cir. 2017) (quoting *Sandler v. All Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992)). Apart from noting an apparent inconsistency in H&M's contribution practices, NEAP offers nothing more than a scintilla of evidence to suggest that the work in question was *not* outside telephone work. In comparison, H&M presents several supported justifications for its position.

First, H&M offers the testimony of H&M Vice President of Labor Relations

Stephen Freind, who negotiated the 2011 MOU II. Freind explained that "the general

terminology was, outside telephone work is anything, communications performed

outside." (ECF No. 30-4, PageID.401). Second, H&M submits a report by Gary Smith—

an individual with 30 years of experience working with Local 17 and Local 876 since the

1980s—stating that "fiber optic cable placement has always been considered outside

telephone work and completed under the Tele-Data agreement." (ECF No. 30-12,

PageID.445.) And third, H&M explains that the work at issue falls under the Michigan

Metropolitan Extension Telecommunications Right-of-Way Act which broadly defines

"telecommunication facilities" to include "copper and fiber cables, lines, wires, switches,

conduits, pipes, and sheaths, which are used to or can generate, receive, transmit,

carry, amplify, or provide telecommunication services or signals." M.C.L. 484.3102(j).

(ECF No. 30, PageID.363.) H&M's position is further corroborated by the testimony of

Jon Joyson, Director of Central Telecom who oversees the Verizon project, and who

explained that when he bid on the Verizon project, he assumed that he was bidding on

a project for outside telephone work. (ECF No. 30-6, PageID.409.)

Although not entirely clear, NEAP appears to argue in response that fiber-optic

work is not necessarily outside telephone work because the Agreement differentiates

between the terms outside telephone work and fiber optic cable work.[3] But even if fiber

---

[3] The 2011 MOU II states "in the event of any conflict between the provisions of this MOU and the provisions of the aforementioned Agreement, the provisions of this MOU shall prevail and take precedence." (Joint Statement ¶¶ 14–16.) To the extent NEAP argues that the 2011 MOU II conflicts with the terms of the Agreement, its argument fails because the terms of the 2011 MOU II control.

optics may be used for non-telephone functions, NEAP cannot defeat H&M's properly

supported motion. The undisputed facts, as outlined in the Joint Statement of Facts,

offer no support to NEAP's position that the installation of fiber optics for the Verizon

project serves a non-telephone function. Instead, the facts and evidence before this

court support the single conclusion that the fiber optic cable work—undertaken as part

of a project to support a mobile network for one of the nation's largest telephone

providers—constitutes outside telephone work.

## VI. CONCLUSION

For the reasons explained above, the 2011 MOU II remains in effect and governs

the type of work for which H&M must make contributions. The only admissible evidence

presented supports the conclusion that the work at issue falls within the meaning of

"outside telephone work" for which H&M had no contractual obligation to contribute.

Accordingly,

IT IS ORDERED that NEAP's motion for summary judgment (ECF No. 31) is

DENIED and H&M's motion for summary judgment (ECF No. 30) is GRANTED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: December 4, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 4, 2019, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\HEK\Civil\18-13701.NATIONALELECTRICAL.msj.erisa.HEK.2.docx