# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  February 16, 2021

Ms. Sarah J. Hartman
City of Grand Rapids
Department of Law
300 Monroe Avenue, N.W., Suite 620
Grand Rapids, MI 49316

Mr. George Harold Kruszewski
Watkins, Pawlick, Calati & Prifti
1423 E. Twelve Mile Road
Madison Heights, MI 48071

Mr. Brian M. Schwartz
Miller Canfield, 150 W. Jefferson Avenue
Suite 2500
Detroit, MI 48226

Re:  Case No. 20-1024, *Natl Electrical Annuity Plan v. Henkels & McCoy, Inc.*
Originating Case No. : 3:18-cv-13701

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Ms. Kinikia D. Essix

Enclosure

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0091n.06

No. 20-1024

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 16, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NATIONAL ELECTRICAL ANNUITY PLAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| HENKELS & MCCOY, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE:     BOGGS, DONALD, and THAPAR, Circuit Judges.

BOGGS, Circuit Judge. The National Electrical Annuity Plan ("NEAP") seeks contributions that it alleges Henkels & McCoy, Inc. ("H & M") owes NEAP for work performed by H & M's union employees under a collective-bargaining agreement. Whether H & M owes NEAP these contributions hinges on the validity of a memorandum of understanding between H & M and two local unions as well as the meaning of an undefined term in that memorandum. In the district court, the parties brought cross-motions for summary judgment. NEAP's was denied, and H & M's was granted.

The district court erred in finding "outside telephone work" unambiguous and construing the agreement in H & M's favor. Because "outside telephone work" is ambiguous and there is a genuine dispute of material fact over its meaning, we reverse the district court's grant of judgment to H & M, affirm its denial of judgment to NEAP, and remand for further proceedings.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

## I.  FACTUAL AND PROCEDURAL SUMMARY

NEAP is a trust fund established under and administered according to the Labor-Management Relations Act of 1947, as amended, and the Employee Retirement Income Security Act of 1974 ("ERISA"). H & M is a Pennsylvania corporation certified to do business in Michigan. The International Brotherhood of Electrical Workers ("IBEW") is a labor union representing about 775,000 active and retired American and Canadian workers in various fields including utilities, construction, and telecommunications. *IBEW > Who We Are*, http://www.ibew.org/Who-We-Are (last visited Feb. 16, 2021). IBEW Local Unions 17 and 876 ("the locals") are branches of the IBEW with jurisdiction in Michigan. Locals 17 and 876 are "outside locals": they perform work outside buildings, while other IBEW locals perform work inside buildings.

### A.  The Agreements

In 1995, IBEW and H & M entered into a national collective-bargaining agreement. In early 2011, H & M and the locals signed a set of supplementary appendices (the "2011 appendices") to the 1995 national agreement between H & M and IBEW. The three signatories[1] also signed several memoranda of understanding that also purported to supplement the agreement—two in late 2011 (the "first 2011 memorandum" and the "second 2011 memorandum," respectively) and one in late 2014 and early 2015 (the "2014 memorandum").[2] And in 2017, the signatories signed a new set of appendices (the "2017 appendices"), amending the agreement once more.

We describe the relevant contents of each agreement in more detail, beginning with the scope of the 1995 national agreement between IBEW and H & M. That agreement purported to

> cover[] low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside

---

[1] To distinguish between the parties to the collective-bargaining agreements at issue and the parties to this lawsuit, we denote the former group the "signatories." In this case, the signatories are H & M and the two locals.

[2] Because the parties refer to this last memorandum as the "2014 memorandum," we use the same terminology, even though the last signatory did not execute it until 2015.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

> wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment, railroad communications, micro waves, V-SAT, by- pass, [sic] CATV, WAN (Wide area networks), LAN (local area networks), and ISDN (integrated systems digital network).

(R. 10-2, PageID 125.) But it "does not apply to new construction nor to retrofits in those locals where the Inside Local Union has control of the work." (*Ibid.*) The national agreement took effect on March 1, 1995, and it has remained in effect since. There is a formal mechanism for amendment or termination after advance notice, and the agreement is also "subject to change or supplement at any time by mutual consent of the parties." (*Id.* at PageID 126.)

The 2011 appendices took retroactive effect November 29, 2010, were to "remain in effect until November 27, 2011, unless otherwise specifically provided for [t]herein," and would "continue in effect from year to year thereafter, from November 29, through November 27 of each year unless changed or terminated in the way later provided [t]herein." (R. 10-3, PageID 143.) As with the 1995 agreement, the 2011 appendices contained a formal mechanism for amendment or termination after advance notice and were "subject to change or supplement at any time by mutual consent of the parties." (*Ibid.*) Section 5.07 of the 2011 appendices obligated H & M to contribute 16.5% of gross monthly labor payroll to NEAP "unless [NEAP] authorized otherwise." (*Id.* at PageID 154–55.)

> The first 2011 memorandum states that it

> serve[s] as an addendum to the Teledata Agreement, hereafter referred to as "Agreement", between Employer and Union (which Agreement takes the form of Appendices to the National Teledata Agreement between Employer and the IBEW International), and all successor Agreements, the expiration date of which Agreement is November 27, 2011.

(R. 10-4, PageID 166.) The second 2011 memorandum contains identical language except that it omits "the expiration date of which Agreement is November 27, 2011." The 2014 memorandum has slightly different language: it

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

> serve[s] as an addendum to the Teledata Agreement, hereinafter referred to as ["]Agreement", between Employer and Union, which Agreement takes the form of Appendices to the National Teledata Agreement between Employer and the IBEW International, the expiration date of which Agreement is November 23, 2014.

(R. 10-6, PageID 170.) Unlike the two 2011 memoranda, the 2014 memorandum lacks a clause purporting to supplement "all successor Agreements."

Two of these memoranda extended the duration of the "Agreement." The first 2011 memorandum extended the Agreement for three years, setting November 23, 2014, as its expiration date. The 2014 memorandum extended the Agreement for another two years, until November 20, 2016.[3]

All three memoranda purport to change the amount of wages paid to workers. The first 2011 memorandum expressly increased wages by 2% "effective the first year" and by 2.25% "effective the second and third years." (R. 10-4, PageID 166.) The second 2011 memorandum changed H & M's obligations for "outside telephone work":

> It is agreed and understood that for all outside telephone work performed by Employer:
>
> 1) Employer shall not be required to make any contributions to the National Electrical Annuity Plan (NEAP)
>
> 2) The wages shall be ninety one per cent (91%) of the wage rates of all classifications contained in the aforementioned Agreement and all successor Agreements

(R. 10-5, PageID 168.) And the 2014 memorandum contains the following changes:

> 2) Effective November 24, 2014, there shall be a wage increase of two per cent (2%).
>
> 3) Effective November 24, 2015, there shall be a wage increase of two per cent (2%), and a NEAP increase of one half of one percent (.5%).

---

[3] To call these "expiration dates" is a slight abuse of notation. The agreement between H & M and the locals continues year-to-year even if not extended, so these would not be expiration dates so much as contract-renewal dates.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

> 4) Effective November 24, 2014, the classification of Certified Crane Operator is established, with an hourly wage that is one dollar ($1.00) less than the wage rate of Construction Foreman.

(R. 10-6, PageID 170.)

Last, all three memoranda conclude with a clause aimed at resolving conflicts between the terms: "In the event of any conflict between the provisions of this [memorandum] and the provisions of the aforementioned Agreement, the provisions of this [memorandum] shall prevail and take precedence." (R. 10-4, PageID 166; R. 10-5, PageID 168; R. 10-6, PageID 170.)

Finally, the 2017 appendices took effect retroactively on November 21, 2016. They were to "remain in effect until November 25, 2018, unless otherwise specifically provided for [t]herein," and "continue in effect from year to year thereafter, from November, through November of each year unless changed or terminated in the way later provided [t]herein." (R. 10-7, PageID 172.) The formal amendment and termination procedure for the 2017 appendices, as well as the language allowing the signatories to change or supplement the appendices by mutual consent, is the same as that in the 1995 national agreement and the 2011 appendices. And, as with the 2011 appendices, section 5.07 of the 2017 appendices purports to obligate H & M to contribute a percentage of gross monthly labor payroll to NEAP. For the 2017 appendices, the contribution rate began at 17% and increased to 18% on November 24, 2017.

**B.  The Litigation**

NEAP filed suit against H & M in November 2018 over its alleged failure to pay contributions for work that H & M performed in Michigan. That work, much of which is for Verizon, includes installing a 5G network, MCI small-cell equipment, and over 1,500 miles of overhead and underground fiber-optic cable. NEAP alleges that H & M owes over $350,000 in contributions for the Verizon project and other work between November 2016 and July 2019. H & M denies that it owes contributions for that work, claiming that the second 2011 memorandum exempts it from

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

the contribution requirement for "outside telephone work." In fact, H & M did contribute for several projects between 2012 and 2016 that it now classifies as "outside telephone work," but it contends that those contributions were an administrative error.

After NEAP's complaint survived a motion to dismiss, the parties filed cross-motions for summary judgment. The district court denied judgment to NEAP and granted judgment to H & M. NEAP appeals the district court's ruling on both motions.

## II. LEGAL BACKGROUND

### A. Reviewing Cross-Motions for Summary Judgment

We review de novo a district court's grant of summary judgment. *Jones v. Clark Cnty.*, 959 F.3d 748, 756 (6th Cir. 2020). Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The court does not engage in credibility determinations or weigh evidence; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

This standard does not change "simply because the parties present cross-motions" for summary judgment. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). Instead, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Ibid.* (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). Each party, when

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

considered as the movant, has the initial burden of showing that there is no genuine issue of material fact. *Id.* at 247 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

### B. Interpretation of Collective-Bargaining Agreements

The federal common law of contract, as far as it is consistent with federal labor policy, governs the interpretation of collective-bargaining agreements, "including those establishing ERISA plans." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "The federal common law may draw upon state law principles, but state law is not controlling authority." *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002).

When a contract is unambiguous and "the intent of the parties can be determined from the face of the agreement," its interpretation is a question of law for the court. 11 *Williston on Contracts* § 30:6 (4th ed. 2020). But if a contract is ambiguous, "its meaning is a question of fact"; if there is disputed extrinsic evidence, a jury must determine the parties' intent. *Id.* at § 30:7.

Whether a written contract's terms are ambiguous is a question of law for the court. *Id.* at § 30:5. Generally, the court considers not just the plain language of the contract documents but also "objective indicia that, from the parties' linguistic reference point, the contract's terms are susceptible of different meanings." *Ibid.* These indicia include the contract's structure, the parties' relative bargaining power, their bargaining history, which party drafted the instrument, "so that the language should be construed most strongly against it," and the parties' conduct—at least to the extent that it reflects their understanding of the contract's meaning. *Ibid.*

### III. ANALYSIS

#### A. Whether ERISA Permits H & M to Rely on the Second 2011 Memorandum

As a threshold matter, we first dispose of NEAP's contention that ERISA estops H & M from relying on the second 2011 memorandum in this case. According to NEAP, section 515 of

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

ERISA, 29 U.S.C. § 1145, prohibits H & M from relying on a memorandum not referred to in the "current agreement" to defeat a claim originating from that agreement. NEAP contends that doing so "would run contrary to the principle" of section 302(c)(5)(B) of the Labor-Management Relations Act, 29 U.S.C. § 186(c)(5)(B), that the law "only authorizes employers to make contributions to trust funds established by employee representatives if 'the detailed basis on which such payments are to be made is specified in a written agreement with the employer.'" (Appellant Br. at 33–34 (quoting Labor-Management Relations Act § 302(c)(5)(B)).) The district court dismissed NEAP's argument, relying on this court's precedent to hold that H & M may argue whether it had a contractual obligation to make contributions.

It is not quite that simple. ERISA and this court's precedent have imposed broad restrictions on an employer's ability to escape contribution obligations, and one could infer a rule from those cases that modifications to the contribution requirement that are unknown to the benefit plan are not enforceable against the plan. But because NEAP never points to facts showing that it was not on notice of the second 2011 memorandum, it is not entitled to summary judgment on this ground.

To start, NEAP's argument from § 302(c)(5) is a non sequitur. That paragraph gives necessary conditions for an employer to contribute to an employee trust fund. Subparagraph 302(c)(5)(B) requires, among other things, that there be a detailed, written basis for the contributions. In other words, if there is not a detailed basis for payments, then the employer is prohibited from contributing. What NEAP claims—that if there is not a detailed basis for an *exclusion* from payment, then the employer *must* contribute—does not logically follow.

There is more meat to NEAP's argument from § 515 of ERISA, which requires an "employer who is obligated to make contributions to a multiemployer plan . . . under the terms of a

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

collectively bargained agreement" to make those contributions to the extent consistent with law. If NEAP was truly not on notice of the second 2011 memorandum, allowing H & M to rely on it to escape its contribution obligation might violate the policy behind § 515. *See generally Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148 (7th Cir. 1989) (en banc). Although a multiemployer pension plan is a third-party beneficiary to a collective-bargaining agreement, the law gives it more power than a third-party beneficiary usually has to enforce contractual obligations (specifically, the employer's obligation to contribute). This must be true for the statutory scheme to work. The plans must pay the benefits they promise to employees "even if the contributions they expected to receive do not materialize, perhaps because employers go broke, perhaps because they are deadbeats, perhaps because they have a defense to the formation of the contract." *Id.* at 1151. Other employers must pay more to make up the difference, else employees will not get their promised benefits. *Ibid.*

NEAP offers *Bakery & Confectionary Union & Industry International Health Benefits & Pension Funds v. New Bakery Co.*, 133 F.3d 955 (6th Cir. 1998), to support its reading of § 515. In *New Bakery*, we held that a pension fund that had sued an employer for unpaid contributions was "entitled to rely on the literal terms" of the written agreement between the employer and the union. 133 F.3d at 959. We compared the fund to a "holder in due course in commercial law who is entitled to enforce the writing 'without regard to understandings or defenses applicable to the original parties.'" *Ibid.* (quoting *Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1103 (3d Cir. 1996)). We also held that § 515 "directs us to examine the plan documents and the collective bargaining agreement to determine the scope of" the employer's obligation to contribute. *Ibid.* Analogizing to *New Bakery*, NEAP argues that the 2017 appendices

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

constitute the "agreement" and that the second 2011 memorandum is merely a "side understanding" that H & M cannot advance against NEAP.

But *New Bakery* is not really on point here. In that case, the collective-bargaining agreement had an integration clause, ensuring that the pension fund did not need to look at earlier documents and understandings to determine the employer's contribution obligations. *Id.* at 960; *see also Bakery & Confectionary Union & Indus. Int'l Health Benefits & Pension Funds v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). The pension fund could therefore rely on the literal terms of the agreement. After all, the parol-evidence rule makes unintegrated documents inadmissible "for the purpose of modifying or adding to the terms of the agreement." *Richards v. Gen. Motors Corp.*, 991 F.2d 1227, 1233 (6th Cir. 1993). But here, the 2017 appendices lack an integration clause, and our rationale in *New Bakery* does not apply.

Closer to the mark is *Northwestern Ohio Administrators, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018 (6th Cir. 2001), raised for the first time in NEAP's reply brief on appeal. There, the defendant employer signed project agreements incorporating the terms of a preexisting collective-bargaining agreement. *Id.* at 1022. Those terms required the employer to contribute to fringe-benefit and pension plans for both union and nonunion employees, but the employer claimed that it had intended to pay benefits for union employees only. *Ibid.* The employer's and union's negotiators had made ambiguous handwritten annotations on the preprinted project agreements—the employer claimed that those annotations limited benefit payments to union employees, while the union negotiator contended that they represented a "floor for union participation, not a ceiling." *Ibid.* The plan administrator sued the employer for unpaid contributions for its nonunion employees, claiming in part that ERISA entitled it to "rely only on the printed terms" of the project agreements. *Id.* at 1023.

- 10 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

We agreed with the plan administrator. *Id.* at 1025. Although it was clear that the union and the employer had sought to amend the project agreements, the controlling question was whether the union and employer had put the administrator "on notice of the intended amendments" through their "cryptic" annotations. *Id.* at 1024. The annotations were not in a prominent place— they were "inserted near the signature line rather than in the body of the contract, or adjacent to any related provision." *Ibid.* (contrasting with a written scope limitation in a collective-bargaining agreement in *Craig v. Severino, Inc.*, No. 93-3516, 1994 WL 259456 (6th Cir. June 13, 1994), in which we agreed that "there was nothing secret about" the added term). Nor did the signatories "attempt to excise, cross-out, or otherwise manifest their intent to nullify the portion of the pre-printed contract . . . or otherwise to call attention to the modification." *Ibid.*

Also relevant is *Brown-Graves Co. v. Central States, Southeast & Southwest Areas Pension Fund*, 206 F.3d 680 (6th Cir. 2000). There, the employer had signed a collective-bargaining agreement exempting the employer from contributing for "casual drivers," a term undefined in the contract. *Id.* at 683. The employer had privately adopted a definition of "casual" that included all employees with less than four years of tenure. *Ibid.* We held that the pension fund had "no notice of the unusual meaning" the employer gave to the term and that the employer was obliged to contribute for employees not meeting the "ordinary meaning" of "casual." *Ibid.*

These cases may imply a rule that, if a multiemployer fund that is a third-party beneficiary to a collective-bargaining agreement has no knowledge of a side agreement between the employer and union, then the fund may enforce the collective-bargaining agreement without regard to that side agreement. While that rule may follow from the Seventh Circuit's policy argument in *Gerber*, we have not expressly adopted it. *See Craig v. Severino, Inc.*, No. 93-3516, 1994 WL 259456 (6th Cir. June 13, 1994).

- 11 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

But even were we inclined to adopt such a rule, we would not do so here. NEAP did not allege in the district court that it had no notice of the second 2011 memorandum or point to any evidence that it did not. It only argued that it was *entitled to* such notice. Our precedent does not go so far. And NEAP has not shown a genuine dispute over actual notice, so even if a rule barring enforcement of undisclosed side agreements governed, summary judgment in NEAP's favor would be inappropriate. Thus, we need not and do not reach that question.

### B. The Extent to Which the Second 2011 Memorandum Still Governs the Agreement

Another legal dispute between the parties—whether the second 2011 memorandum is still in effect—has two answers, depending on the scope of the question. At a macroscopic level, H & M and the locals unambiguously intended the memorandum to apply to the 2017 appendices. Each of the 2011 memoranda states that it "serve[s] as an addendum to the . . . 'Agreement', between Employer and Union . . . and all successor Agreements." (R. 10-4, PageID 166; R. 10-5, PageID 168.) Both 2011 memoranda define the "Agreement" to mean the "Appendices to the National Teledata Agreement between Employer and the IBEW International." (R. 10-4, PageID 166; R. 10-5, PageID 168.) When the signatories executed the 2011 memoranda, there was only one relevant set of appendices—the 2011 appendices—to the agreement between H & M and IBEW. The first 2011 memorandum further defines the meaning of the "Agreement" by stating "the expiration of which Agreement is November 27, 2011." (R. 10-4, PageID 166.) When the signatories executed the 2011 memoranda, the 2011 appendices were due to expire on November 27, 2011. And although the second 2011 memorandum does not contain the same clause, both 2011 memoranda were executed on the same dates by each signatory. They should therefore be read in *pari materia*, taking "Agreement" to mean the same in both. *See, e.g.*, *Columbus, H.V. & T. Ry. Co. v. Pa. Co.*, 143 F. 757, 762–63 (6th Cir. 1906) (citing *Chicago v. Sheldon*, 76 U.S. (9 Wall.) 50, 55

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

(1869)). So the signatories unambiguously intended the two 2011 memoranda to govern the 2011 appendices.

They therefore govern the 2017 appendices too. Those appendices are either part of the same "Agreement" as the 2011 appendices or else are a "successor Agreement"—either way, both 2011 memoranda apply to them.[4] Moreover, the 2017 appendices nowhere purport to completely rescind either of the 2011 memoranda. So both 2011 memoranda continue to govern the 2017 appendices.

But even though the second 2011 memorandum is still broadly "in effect," that is not necessarily true at the microscopic level. Specific terms of an earlier agreement may be superseded by specific terms in the later appendices. In general, if a term in a later contract or modification is inconsistent with a term in the original agreement, the later term rescinds the original term. 29 *Williston on Contracts* § 73:17; 17B *C.J.S. Contracts* § 604 (2020). For example, the adoption of November 25, 2018, as the agreement's expiration date in the 2017 appendices trumps the stated expiration date of November 23, 2014, in the first 2011 memorandum. Likewise, the wages set out in section 5.03 of the 2017 appendices supplant the wage-increase provisions in the first 2011 memorandum. (And although these terms had already been supplanted by terms in the 2014 memorandum, even without the 2014 memorandum, the terms in the 2017 appendices would still trump the conflicting terms in the 2011 memoranda.)

Here, the 2017 appendices do not contain the exclusion for "outside telephone work" that was in the second 2011 memorandum. The 2017 appendices instead obligated H & M to pay NEAP specific percentages of gross monthly labor payroll. Our question is whether this is an

---

[4] That is not to say the 2014 memorandum does not apply to the 2017 appendices. Although it lacks the phrase "and all successor Agreements," (R. 10-6, PageID 170), the 2017 appendices might be a modification of the original "Agreement" rather than a whole new successor agreement. If so, the 2014 memorandum would govern them. But we do not answer that question here because it is not necessary to decide the case before us.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

inconsistency that rescinds the earlier exclusion. NEAP argues that, yes, the lack of an exclusion for "outside telephone work" is inconsistent with the second 2011 memorandum's exclusion. H & M agrees with the district court, which found that these terms are not actually inconsistent. H & M's argument has some merit—unlike different expiration dates for the same agreement or different wage rates for the same job, which could not coexist in the same contract, the 2017 appendices' contribution requirements might still kick in whenever the second 2011 memorandum does not excuse them. *See, e.g., Joseph v. Rottschafer*, 227 N.W. 784, 786 (Mich. 1929) (adopting the term "inconsistent" to describe two contract terms that cannot "stand together"); *Decca Records, Inc. v. Republic Recording Co.*, 235 F.2d 360, 363 (6th Cir. 1956) (collecting cases, including *Joseph*).

But before we can continue this analysis, we must determine what "outside telephone work" means. Unsurprisingly, the parties offer competing interpretations. NEAP says the term does not include fiber-optics work such as the Verizon project, and H & M says it includes all outdoor telecommunications work that the locals would perform.

Our first step is to determine whether "outside telephone work" is reasonably susceptible of multiple meanings. If a "contract employs a critical term which is not defined," that term may generate an ambiguity, but a court should first use all the interpretive tools available to it to ascertain the term's meaning before declaring it ambiguous. 11 *Williston on Contracts* § 30:4; *see also United States v. Tennessee*, 632 F. Supp. 2d 795, 801–02 (W.D. Tenn. 2009) (finding that, although the use of the undefined term "community" in a contract was "initially ambiguous," the standard tools of interpretation resolved the ambiguity).

Here, "outside telephone work" is a critical term left undefined in the collective-bargaining agreement. It is not immediately clear whether the signatories intended "telephone work" to

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

include fiber-optics work or not. Because it is initially ambiguous, we attempt to deploy standard contract-interpretation tools to remove the ambiguity. We begin by walking through the pertinent bodies of evidence. Then, using those interpretive tools, we determine what interpretations of the phrase the evidence can reasonably support.

## C. Considering H & M's Motion for Summary Judgment

### 1. H & M's Contentions and Supporting Evidence and NEAP's Response

In its motion for summary judgment, H & M asserted that "outside telephone work" includes fiber-optic cable installation. (R. 30, PageID 361.) It supported that proposition in its motion through the following contentions. We list each contention along with the specific record evidence that H & M pointed to—if any—to support the contention.

- NEAP has implicitly conceded that the work is being performed outside; therefore, it is not "inside telephone work." H & M's motion did not point to any facts in the record to support this assertion. (*Id.* at PageID 362.)

- H & M occasionally remitted contributions to NEAP for outside telephone work due to "payroll errors." H & M pointed to pages in the depositions of Messrs. Joynson and Freind, two of its employees, to support this assertion. (*Id.* at PageID 362, n.11.)

- The "construction methodology" used by H & M and the local union workers to install fiber-optic cable has not changed "since the mid-1980s." H & M did not point to any facts in the record to support this assertion, instead only citing a page in Mr. Joynson's deposition supporting that its clients' usage of the technology might have changed. (*Id.* at PageID 362–63 & n.12.)

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

- The second 2011 memorandum "is not limited to 'copper wire' telecommunications." Again, H & M did not point to anything in the record to support this assertion. (*Id.* at PageID 363.)

- The Verizon project is "being performed under the Michigan Metropolitan Extension tele-communications Right-of-Way Oversight Act," which includes "fiber cables" within its definition of "telecommunication facilities." (*Ibid.*) Although H & M cites the Michigan statute for the definition, it does not support its claim that the work is being performed under this statute with a citation to the record. (*Ibid.*)

We note that the only facts H & M supported with proper citations to the record are Messrs. Joynson's and Freind's testimony that H & M had administrative payroll errors leading it to pay NEAP for what it now calls "outside telephone work."

Now considering other evidence in the record that H & M did *not* cite in its motion for summary judgment—as the district court may do, Fed. R. Civ. P. 56(c)(3)—we also see:

- Mr. Freind's testimony that "the general terminology was, outside telephone work is any-thing, communications performed outside." (R. 30-4, PageID 401.) Indeed, he went further and said that the point of the outside-telephone-work exclusion was to "get rid of NEAP" altogether in order to cut H & M's costs in an increasingly competitive market." (*Ibid.*)

- The declaration of a former H & M employee, Mr. Smith, that "from the mid 1980's fiber optic cable placement has always been considered outside telephone work and completed under the Tele-Data agreement." (R. 30-12, PageID 445.)

- Mr. Joynson's testimony that, when he bid on the Verizon fiber-optics project, he assumed that it was "outside telephone construction" and based his bid on that assumption. (R. 30-6, PageID 409.)

- 16 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

- The admission elicited from Mr. Shaffer, the business manager for one of the locals, that fiber-optic lines can carry telephone signals. (R. 32-8, PageID 585–86.)

And NEAP's response to H & M's motion contends the following:

- The 1995 Teledata Agreement covers, by its terms, "low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment . . . ." (R. 37, PageID 843–45 (citing R. 36, PageID 809).)

- H & M made over $540,000 in contributions to NEAP for what it now contends is outside telephone work. (*Id.* at PageID 845–46 (citing *id.* at PageID 850).)

- The second 2011 memorandum was drafted by either Ms. Gannon or Mr. Freind, both H & M employees. (*Id.* at PageID 846–47 (citing R. 36, PageID 815)).

2. *What Interpretations of "Outside Telephone Work" May Be Reasonably Inferred*

The main question the parties present is what is the relationship, if any, between the fiber-optics work performed by the local unions and the term "outside telephone work." The evidence cited in H & M's motion and NEAP's response permits three categories of relationships. First, "outside telephone work" could exclude fiber-optics work. Second, the term could include fiber-optics work but not *all* work the local unions do. Third, the term could encompass fiber-optics work as well as all of the local unions' work.

We will discuss the evidence listed above and analyze which interpretation each reasonably supports.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

      a.   Evidence from the Language and Structure of the Agreements

      The 1995 national agreement between H & M and IBEW contains a laundry-list statement of the scope of the work that the agreement covers. This statement separately identifies "telephone" and "fiber optic cable and equipment." The interpretive canon presuming consistent usage suggests that "telephone" means something different from "fiber optic cable and equipment." *See United States v. Cmty. Health Sys., Inc.*, 666 F. App'x 410, 414–15 (6th Cir. 2016); 11 *Williston on Contracts* § 32:6.

      H & M misses the point in its response that the term "outside telephone work" does not appear in the scope statement. It is irrelevant whether that phrase appears in the scope statement. The point is merely that "telephone" and "fiber optic cable and equipment" are separately listed in the 1995 agreement, so it is reasonable that the signatories of the later appendices and memoranda modifying the 1995 agreement construed them as different semantic units.

      But the usages of "telephone" throughout the appendices signed by the local unions muddy the waters. First, a background observation: The 1995 national agreement between H & M and IBEW calls itself a "Teledata Agreement," establishing that the broad classification of the kinds of work at issue is "teledata." The appendices and memoranda continue that usage of "teledata," modifying nouns such as "work" or "industry" to indicate a relationship to many kinds of telecommunications media. The vice president of labor relations at H & M also testified that "teledata" means "virtually all type of communications work." (R. 30-4, PageID 400.) NEAP has not disputed that characterization of "teledata."

      Comparing the appendices' usages of "telephone" and "teledata" shows that they use "telephone" in a general sense, similar to "teledata." The most direct evidence is the appendices' sections on safety rules, which uses "telephone" exclusively in that general sense. (R. 10-3, PageID

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

156 ("These Rules . . . contain the basic rules for all outside construction, installation, maintenance and removal work when performed for *Telephone* Utilities and any other communications work including CATV work, railroad communication, signal systems, cathodic protection and interconnect. . . . These Rules have been made in the interest of the safety of all *telephone* workers and the public. . . . Suggestions for changes in the Rules to promote safety are invited from all *telephone* employees." (emphases added)); R. 10-7, PageID 185 (same).)

And at the beginning of both sets of appendices signed by H & M and the locals, "teledata" and "telephone" are simultaneously used in the broad, categorical sense: "This appendix is supplementary to the International Brotherhood of Electrical Workers, National Telephone and Teledata Agreement." (R. 10-3, PageID 143; R. 10-7, PageID 172.) These self-descriptions are curious because the 1995 national agreement between H & M and IBEW actually calls itself a "Teledata Agreement," not a "Telephone and Teledata Agreement." (R. 10-2, PageID 125.) Even more perplexingly, neither of the 2011 memoranda nor the 2014 memorandum—all signed by the same signatories as the appendices—use "Telephone" in describing the national agreement. Instead, they all use "Teledata."

Although the canon presuming consistent usage might counsel an interpretation of "Telephone" and "Teledata" as distinct concepts, that presumption is not absolute. *Cmty. Health Sys.*, 666 F. App'x at 418 (stating that the presumption "can assuredly be overcome by other indicia of meaning" (quoting *United States v. Hayes*, 555 U.S. 415, 425 (2009))). It would be reasonable in light of the above observations to treat them synonymously. Rather than indicating a dichotomy, their usage could instead reflect that "telephone" is an older catchall term for telecommunications media, "teledata" is the newer term in the process of supplanting it, and their mixed usage in the appendices and memoranda reflects that transition.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

Thus, from this body of evidence, a reasonable factfinder could determine that the signatories intended "outside telephone work" to exclude fiber-optics work or to include all the local unions' work (if the signatories intended "telephone" to be as broad as "teledata")—that is, either our first possible interpretation or our third.

    b.  Evidence of Customary and Trade Usage

The parties' evidence of customs and usage in the trade supports giving the broadest meaning to "outside telephone work."[5] First, Mr. Freind, H & M's vice president of labor relations, who negotiated the 2011 memoranda for H & M, testified that "the general terminology was, outside telephone work is anything, communications performed outside." (R. 30-4, PageID 401.) He further testified that the point of the "outside telephone work" exclusion in the second 2011 memorandum was to "get rid of NEAP" altogether in order to cut H & M's costs in an increasingly competitive market, so "outside telephone work" was meant to cover all the work performed by the locals. (*Id.* at PageID 400–01.)

And Mr. Smith, a former employee of H & M with "over 30 years of experience in the industry and working with the IBEW" declared that "from the mid 1980's fiber optic cable placement has always been considered outside telephone work and completed under the Tele-Data agreement." (R. 30-12, PageID 445.) The only exception he was aware of was "when the fiber optic cable is placed in the static/ground position on electrical transmission towers"—that work was performed under the "Outside Line Agreement." He said he understood "telephone work" to correspond to the "Tele-Data agreement" and electrical work to correspond to the "Line Agreement."

---

[5] Admissible evidence, anyway. *See* Fed. R. Civ. P. 56(c). The district court correctly excluded from consideration NEAP's proffered hearsay testimony from Local 17's business manager about his conversations with Local 876's business manager, who had negotiated the 2011 memoranda. Fed. R. Civ. P. 56(c)(4); *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir. 1997).

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

Other testimonial evidence supports this finding. Mr. Joynson, who oversees the Verizon project for H & M, testified that when he bid on the project, he assumed it was "outside telephone construction" and grounded his bid's pricing on that assumption. Fourth, Mr. Shaffer, Local 17's business manager, admitted in his deposition that fiber optic lines can carry telephone signals.

It is reasonable to conclude from this testimony that "outside telephone work" includes everything the locals do. A reasonable factfinder could also disbelieve the testimony of the current and former H & M employees but at least credit Mr. Shaffer's testimony to find that "outside telephone work" reaches fiber optics because fiber-optic cables carry telephone signals.

But without more to connect "telephone" to the very broad term "telecommunications," we cannot reasonably conclude anything from H & M's additional contention that the Verizon project is "being performed under the Michigan Metropolitan Extension Telecommunications Right-of-Way Oversight Act, Mich. Comp. Laws § 484.3101–20 (defining "telecommunications facilities" to include "fiber cables, lines, [and] wires" in § 484.3102(j)). That assertion is unlike the connection between "telephone" and "teledata" in the appendices signed by H & M and the locals, which speaks directly to the parties' understanding of the terms. Here, the definition given to "telecommunications facilities" by Michigan law—which H & M fails to connect to the term "telephone" with record evidence—has at best an attenuated connection to the parties' understanding of the term "outside telephone work."

    c.   H & M's Conduct as Evidence

In its response to the motion, NEAP argues that H & M's continuing contributions to NEAP is evidence that the work for which H & M contributed is not "outside telephone work." NEAP hired an auditor who determined that, between 2012 and 2016, H & M contributed over $540,000 for work that H & M now claims is "outside telephone work." By contrast, NEAP claims

- 21 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

that H & M *failed* to contribute only about $19,000 that it would have been required to contribute during that same period (assuming NEAP's interpretation of the second 2011 memorandum is correct). H & M disputes the accuracy of the auditor's determination, and it "contends that any contributions made for what it considered to be outside telephone work was an administrative error." (R. 36, PageID 826.)

In resolving whether a contract term is ambiguous, the court may properly consider extrinsic evidence of "any conduct of the parties which reflects their understanding of the contract's meaning." 11 *Williston on Contracts* § 30:5. Here, as NEAP argues, it is reasonable to infer from the payroll records produced during discovery that H & M believed at least some of the work it has now classified as "outside telephone work" was nevertheless subject to a contribution requirement. H & M's rebuttal that $540,000 in contributions—more than NEAP now seeks in relief— was a mere administrative error that went unnoticed by H & M for four years in an increasingly competitive market—one that H & M's negotiator testified led him to insert the "outside telephone work" exclusion in the first place—may not compel assent.

But without further evidence about, for example, which projects H & M contributed for and what percentage of payroll it contributed for each project, we can draw few concrete inferences. For example, did H & M consistently fail to contribute for fiber optics but always contribute for other outdoor projects? If so, perhaps "outside telephone work" included fiber optics but not all the locals' work. It is also unclear why some of the "outside telephone work" had a contribution rate of "9.0%," all of which was coded "T 9 TELECOMM:COMBINED WORK" in the payroll records that H & M produced. (R. 35-2, PageID 649–718.) Nine percent was not among the rates contained in any document making up the agreement. Also potentially relevant is the extent to

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

which H & M observed the second 2011 memorandum's provision reducing wages for "outside telephone work" by nine percent.

In any case, confronted with this evidence, a reasonable factfinder could conclude that "outside telephone work" did not include any of the work for which H & M in fact contributed.

### d. The Signatories' Relative Bargaining Power and *Contra Proferentem*

NEAP also argues that the court should construe the collective-bargaining agreement—specifically, the second 2011 memorandum and the 2017 appendices—against H & M for two reasons. First, NEAP claims, H & M had the "position of greater bargaining power" over the locals in negotiating the 2017 appendices; second, H & M drafted the second 2011 memorandum. (Appellant Br. at 25–26). These considerations are appropriate in determining whether a contract is "susceptible of different meanings." 11 *Williston on Contracts* § 30:5.

The parties dispute whether there was actually an imbalance of bargaining power. NEAP argues that H & M's negotiator of the 2017 appendices knew about the second 2011 memorandum—he had negotiated it—while the locals' negotiators "were unaware of it." (Appellant Br. 26.) But Local 17 had a copy of the second 2011 memorandum in its files—its negotiator's ignorance of the memorandum cannot be held against H & M. And in any case, the term in question, "outside telephone work," is in the second 2011 memorandum, not the 2017 appendices, so it is not immediately apparent why any imbalance of power in negotiating the appendices is relevant to the meaning of that phrase. From these facts, a factfinder could not reasonably infer that there was an imbalance of power affecting the interpretation of "outside telephone work."

Nevertheless, it is undisputed that H & M drafted the second 2011 memorandum. That is a separate consideration from whether there was an imbalance of power. H & M had a clear motive for the "outside telephone work" exclusion—to save costs—and the locals only stood to lose from

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

including that term. Moreover, as drafter, H & M "was in the best position to prevent the ambiguity." *Nw. Adm'rs, Inc. v. B.V. & B.R., Inc.*, 813 F.2d 223, 226 (9th Cir. 1987). Because whether or not to apply the *contra proferentem* doctrine is left to the finder of fact, *see Webb v. GAF Corp.*, 936 F. Supp. 1109, 1118–19 (N.D.N.Y. 1996), we must assume for purposes of H & M's summary-judgment motion that a reasonable factfinder would apply it to favor any interpretation supporting NEAP.

### 3. Which Inferences Favor Each Party

Having examined the evidence and determined that "outside telephone work" is reasonably susceptible of multiple meanings even after using the standard tools of contract interpretation, we conclude that it is an ambiguous term. We now determine which party benefits from each interpretation. This is necessary to ensure that we draw inferences in the light most favorable to the nonmovant—specifically, the inferences tending to support nonmovant-friendly interpretations (if any exist)—when we decide the summary-judgment motions.

#### a. If "Outside Telephone Work" Does Not Include Fiber Optics

If "outside telephone work" does not include fiber optics, then the contribution exclusion in the second 2011 memorandum does not apply to the work at issue, which the parties agree is fiber-optics work. (R. 36, PageID 824.) This interpretation would entitle NEAP to judgment.

#### b. If "Outside Telephone Work" Includes Fiber Optics but Not All the Locals' Work

If "outside telephone work" includes fiber optics but not all categories of work the locals perform, then the contribution exclusion in the second 2011 memorandum would not rescind the 2011 appendices. As H & M argues, there would exist some kinds of work for which the contribution requirement would still exist. The revised contribution percentages in the 2014 memorandum and 2017 appendices could then coexist with the second 2011 memorandum's contribution exclusion. But because fiber optics would fall within the ambit of "outside telephone work," the

- 24 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

work at issue in this case would be subject to the contribution exclusion, and H & M would have no obligation to contribute for that work. Thus, H & M would be entitled to judgment.

c. If "Outside Telephone Work" Includes All Work the Local Unions Do

The interpretation that "outside telephone work" includes all work the locals perform may initially seem to favor H & M. Indeed, H & M has presented evidence supporting this interpretation and advocates for it.

But this interpretation actually favors NEAP.

To see why, we note that H & M argues that the 2017 appendices' contribution requirements are consistent with the second 2011 memorandum's "outside telephone work" exclusion. (Appellee Br. 32–33.) So long as the locals perform some work that is not "outside telephone work," that exclusion does not apply, and H & M would be on the hook to contribute. (*Id.* at 33 n.6.)

But if "outside telephone work" covers all the work the locals do, the second 2011 memorandum's exclusion cannot coexist with the 2017 appendices' requirement to contribute to NEAP. The two terms could not then "stand together," *Joseph*, 227 N.W. at 786, because all the work falling under the 2017 contribution requirement would also fall under the 2011 contribution exclusion. Thus, because the later adopted of two inconsistent terms rescinds the earlier one, 29 *Williston on Contracts* § 73:17, the contribution exclusion for "outside telephone work" in the second 2011 memorandum would have rescinded the contribution requirement of the 2011 appendices.

Against this backdrop in which H & M would have no contribution requirement, the company then agreed to two things. First, the 2014 memorandum, which stated: "Effective November 24, 2015, there shall be . . . a NEAP increase of one half of one percent (.5%)."[6] (R. 10-6, PageID

---

[6] The 2011 appendices had set the contribution rate at 16.5% starting in November 2008, before the appendices came into effect. True, the parties would have rescinded that requirement under the interpretation we now consider, and

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

170.) Second, the contribution percentages of 17% and 18% in the 2017 appendices. An obligation to contribute at a specified rate cannot coexist with a complete lack of obligation to contribute. Both the 2014 memorandum and the 2017 appendices are inconsistent with the second 2011 memorandum. So the elimination of the contribution requirement would be rescinded.

The district court's contrary analysis erred in several respects. First, it charged NEAP with failing to "familiarize itself" with the second 2011 memorandum before negotiating later agreements. (R. 39, PageID 1042.) But NEAP did not negotiate anything at issue here—H & M and the locals did.

Second, the district court cited *Omnicom of Michigan v. Giannetti Investment Co.*, 561 N.W.2d 138, 140–41 (Mich. Ct. App. 1997), for the categorical rule that, if "the second agreement does not completely cover the subject matter of the first, the contested provisions contained in the first agreement remain in effect." (R. 39, PageID 1043.) But *Omnicom* was not so broad. Rather, *Omnicom* said that if two contracts "relate to the same subject matter," then "the parties' intention must be gleaned from both documents." *Id.* at 140 (citing *Culver v. Castro*, 338 N.W.2d 232, 234 (Mich. Ct. App. 1983)). Following that maxim, *Omnicom* examined the two agreements and found that the "second agreement does not delve into the specific installation matters addressed in the first agreement . . . ." *Id.* at 140–41. From there, it concluded that those "specific provisions of the first agreement were not rescinded by the second agreement." *Id.* at 141. That is consistent with *Nib Foods, Inc. v. Mally*, 246 N.W.2d 317 (Mich. Ct. App. 1976), which *Omnicom* also relied on. *Nib Foods* construed an agreement and later lease "together as part of the total accord," finding that the later lease superseded "only the lease portions of the prior agreement."

---

raising the NEAP rate by 0.5% from 0% would yield a rate of 0.5%. But it would be unreasonable to conclude that the signatories intended to "increase" a contribution rate that did not exist anymore. The only reasonable reading would be that the signatories intended to raise the previously effective rate of 16.5% to 17%.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

*Id.* at 321. Insofar as Michigan's law of contract informs the federal common law, the district court erroneously applied it.

Third, assuming without deciding that *Joseph*, another Michigan case, correctly states the federal common law of contract, the district court misapplied it. The district court examined extrinsic evidence to hold that, even if the second 2011 memorandum and 2017 appendices were inconsistent, the parties had not intended to abrogate the first contract, citing *Joseph*, 227 N.W. at 786, for the proposition that such intent is required. But that is not *Joseph*'s full statement. It continues: "But, where there is no ambiguity in the language used in the *new contract*, there must be some expression *therein* from which a lack of such intent may be reasonably inferred to justify the admission of proofs relative thereto . . . ." *Ibid.* (emphasis added).

So, under *Joseph*, to even reach the question whether the parties intended to rescind the 2011 rescission, there must be something in the 2017 appendices *themselves* from which a factfinder may infer that the NEAP contribution was not actually required. Far from that, the 2017 appendices restate the same mandatory language of the 2011 appendices: "unless authorized otherwise by the National Electrical Annuity Plan ('NEAP'), the individual employer *will* forward monthly to NEAP's designated collection agent an amount equal to [a specified percentage] of the gross monthly payroll . . . ." and "[a]n individual employer who fails to remit as provided above *shall* be additionally subject to having his agreement terminated upon seventy-two (72) hours notice . . . ." (R. 10-3, PageID 154–55; R. 10-7, PageID 184–85 (emphases added).) So, in this posture, the district court erroneously applied *Joseph* by using extrinsic evidence about the 2017 appendices' negotiations to find that rescission was unintended.

One lingering question: What of the second 2011 memorandum's clause that its terms "prevail and take precedence" over any conflicting terms in the agreement? (R. 10-5, PageID 168.)

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

Applying that rule strictly would prevent the signatories from, say, changing the agreement's expiration date or increasing wages. Parties to a contract cannot bind themselves not to change it later by mutual consent. 29 *Williston on Contracts* § 73:18. So we must not construe the memoranda's rule of construction to apply to terms that the signatories later intentionally superseded by agreement. Because the 2014 memorandum and the 2017 appendices unambiguously include contribution requirements, the only reasonable reading (under the interpretation of "outside telephone work" encompassing all work the locals do) is that the parties intended those contributions to be paid.

Still, H & M insists that eliminating or changing terms of the agreement requires some advance notice of intent to modify, and the parties agree that neither local sent such notice before negotiations for the 2017 appendices occurred. Thus, it contends, the 2017 appendices could not have rescinded the contribution exclusion in the second 2011 memorandum. True, neither local gave notice of its desire to change the terms of the second 2011 memorandum according to the procedures outlined in the 2011 appendices. But that is not the only modification procedure the appendices provided for—they also expressly allow change by mutual consent.

H & M further argues that there was a practice to require collectively bargained terms to be expressly renegotiated before being canceled or modified. If so, that practice was not uniform. The letter H & M received from Local 876 before its negotiations for the 2014 memorandum did not specify any details of the terms to be renegotiated, even though that memorandum's terms included wage increases whose validity H & M has not disputed. And in any case, ERISA does not permit H & M to escape the plain meaning of the contribution obligation based on unwritten

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

negotiation practices.[7] *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1051 (6th Cir. 2015).

### 4. Deciding H & M's Motion

Finally, having examined which reasonable inferences can be drawn from the record and which inferences favor each party, we return to the beginning: H & M's motion. We apply the burden-shifting scheme of Federal Rule of Civil Procedure 56. First, the movant must make an initial showing that there is no genuine dispute of material fact by pointing to specific evidence in the record. Fed. R. Civ. P. 56(c)(1)(A). The nonmovant need not respond to the motion at all if it is confident the movant is not entitled to judgment even if the movant's evidence is undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it . . . ."); *see also* Fed. R. Civ. P. 56(e) advisory committee's note to 2010 amendment.

But if the movant makes an initial showing that there is no genuine issue of material fact and that it is entitled to judgment, the burden of production shifts to the nonmovant. Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("[T]he nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" (quoting former Fed. R. Civ. P. 56(e) (1963)). If the nonmovant fails to provide

---

[7] Similarly, although H & M does not raise the issue, it could not have sought to avoid the obligation on the basis that it was mistaken about the effect of adding NEAP contribution terms to the 2014 memorandum and the 2017 appendices. ERISA bars that defense, too.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

specific evidence showing that there is a genuine dispute or that the movant is not entitled to judgment, then the movant is awarded judgment.

Here, H & M does not make a sufficient initial showing. As noted above, H & M properly supported only its contention that it had administrative payroll errors leading it to pay NEAP for what H & M now calls "outside telephone work." That evidence reasonably supports an interpretation of "outside telephone work" excluding the work at issue in this case, and that interpretation favors NEAP. H & M's motion therefore failed to establish that it is entitled to judgment. Indeed, the burden of production never shifted to NEAP.

The district court also had the discretion to look at other pertinent evidence in the record before deciding the motion. Fed. R. Civ. P. 56(c)(3). But even considering all the evidence above, a factfinder could still have reasonably found "outside telephone work" to have any of the three meanings discussed above. Because two of those reasonable meanings entitle NEAP to judgment, there is still a genuine dispute of material fact, and H & M failed to show that it was entitled to judgment. So the district court should have denied H & M's motion for summary judgment.

## D. Considering NEAP's Motion for Summary Judgment

Largely following the same analysis as above, we conclude that NEAP also failed to establish that there is no genuine issue of material fact. NEAP presented no factual contention in its motion for summary judgment that has not been discussed above, and there are no additional reasonable interpretations of "outside telephone work" that arise upon considering its motion. Because one of those reasonable interpretations would entitle H & M to judgment, there is still a genuine dispute of material fact, and NEAP failed to show that it was entitled to judgment. The district court therefore properly denied NEAP's motion for summary judgment.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

## IV. CONCLUSION

We AFFIRM the district court's denial of NEAP's motion for summary judgment, RE-VERSE the grant of H & M's summary-judgment motion, and VACATE the judgment in favor of H & M. Because "outside telephone work" is ambiguous and there is a genuine factual dispute over its meaning, we REMAND for the district court to conduct additional proceedings consistent with this opinion to resolve that dispute.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

THAPAR, Circuit Judge, concurring in the judgment in part and dissenting in part. Suppose a construction firm hires workers to upgrade a phone company's network. And suppose all the work is performed outside. Would this count as "outside telephone work"? Both common sense and normal interpretative principles say yes. But the majority reaches a different conclusion, so I respectfully dissent.

I.

Construction firm Henkels & McCoy, Inc. ("H&M") entered into a collective-bargaining agreement with the International Brotherhood of Electrical Workers ("IBEW"). This national agreement sets forth the relationship between H&M, IBEW, IBEW's local unions, and union workers. H&M and two local unions then executed supplemental agreements with more specific obligations. They did so through appendices and memoranda of understanding.

The appendices (signed in 2011 and 2017) required H&M to send funds each month to the National Electrical Annuity Plan ("NEAP"). NEAP is a trust that provides retirement benefits to IBEW's workers. The agreements required H&M to send funds based on a percentage of "the gross monthly labor payroll." Separate memoranda of understanding contained targeted amendments that modified the appendices (including the agreement to fund NEAP). Crucial to this case, one memorandum—known as the second 2011 memorandum—carved out "outside telephone work" from the relevant gross monthly labor payroll. This meant that H&M did not have to consider this work when calculating its contribution to NEAP.

Verizon hired H&M to install a 5G network in various parts of Michigan. The work was done outdoors. It included the installation of over 1,500 miles of "aerial and underground fiber optic cable." The question is whether that construction was "outside telephone work."

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

## II.

Federal common law governs the interpretation of collective-bargaining agreements like those at issue here. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). The ultimate goal is to discern the parties' intentions. *Id.* Thus, we give the words the parties chose their ordinary meaning. 11 Richard A. Lord, *Williston on Contracts* § 32:3 (4th ed. 2020 update) ("Williston"). And when those words are clear and unambiguous, that is the end of our inquiry. *M&G Polymers*, 574 U.S. at 435 (citation omitted); *id.* at 443 (Ginsburg, J., concurring).

To that end, our job is to approach the words in the contract as an ordinary reader would: by presuming that words are intelligible and looking for "the best reading." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2144 (2016) (book review). Ambiguity exists only when there is no best reading to be found. This happens when a "contract's language supports [multiple] interpretations equally" or when there simply is "*no* reasonable interpretation." *Duncan v. Muzyn*, 885 F.3d 422, 425 (6th Cir. 2018). Only then may courts consider extrinsic evidence of the parties' intentions. *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 894 (6th Cir. 1996); 11 Williston §§ 30:4, 30:7. The language here ("outside telephone work") readily provides a best reading—outdoor work that relates to telephones.

"Unless you've been living under a rock," you've probably heard of 5G. Geoffrey A. Fowler, *The 5G Lie: The Network of the Future Is Still Slow*, Wash. Post, Sept. 8, 2020. It is a new cellphone technology designed to make wireless connections faster. *See* Verizon, *What Is 5G?*, https://www.verizon.com/about/our-company/5g/what-5g (last visited Feb. 12, 2021). So is installation of a 5G network for a well-known phone company telephone work? Seems like it. And did the work take place outside? Everyone agrees that it did. That should be the end of this case.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

Because outdoor work on the Verizon 5G project constituted outside telephone work, H&M did not have to contribute funds to NEAP for work on that project. The district court properly granted H&M's motion for summary judgment on this basis.

### III.

NEAP disagrees. It has scoured the contract to identify confusion and score a payday that was negotiated away in 2011. But its alternative readings of the contract (and those supplied by the majority) could only make sense to lawyers "indoctrinated from the first days of law school to find ambiguity in even the clearest of pronouncements." Kavanaugh, *supra*, at 2139.

### A.

Start with NEAP's arguments (which the majority neither accepts nor rejects). NEAP claims that the term "outside telephone work" is ambiguous. But "simply calling something ambiguous does not make it so." *Duncan*, 885 F.3d at 425. H&M understood its work on the 5G project, all of which took place outdoors, to fall within the outside-telephone-work exclusion. If NEAP disagrees, it must show that H&M's reading is either (1) no better than an alternative or (2) unsupported by the text. *See, e.g.*, *Duncan*, 885 F.3d at 425; *Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 812 (6th Cir. 2007); 11 Williston § 30:5. It did neither.

How about an alternative reading? NEAP insists that outside telephone work does not "mean[] what [H&M] think[s] it means." *The Princess Bride* (Rob Reiner & Andrew Scheinman 1987). But that's about all it does on this front. *See generally* Appellant Br. 13–27; Reply Br. 3–14. A party cannot make a contract ambiguous by simply saying that it is so. And that is the gist of what NEAP does here.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

To be fair, NEAP offers one textual argument about why the contract language does not support H&M's reading. It says that whatever outside telephone work covers, it must not cover the installation of fiber-optic cables. Why? Because the national agreement (not the supplemental appendices or memoranda) distinguishes between "outside telephone work" and "fiber optic cable and equipment" by listing them separately. At first, this sounds persuasive: When two items are listed separately, we naturally assume they have distinct meanings. *See Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 658–59 (6th Cir. 2011) (applying the canon against superfluity).

But the national agreement does not distinguish the terms. Instead, it lists various activities that it covers. And that list includes "fiber optic cable" and "low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire." R. 10-2, Pg. ID 125.[1] Conspicuously absent is any mention of the phrase "outside telephone work" (or even any combination of those three words). In fact, the term "outside telephone work" appears only in the second 2011 memorandum. So NEAP cannot rely on the canon against superfluity to create ambiguity.

Not so, says NEAP. Both the words "outside" and "telephone" are in the list; add them together and you get "outside telephone [work]." But that is easier said than done.

---

[1] Here is the relevant provision from the national agreement:

This Agreement . . . covers low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment, railroad communications, micro waves, V-SAT, by-pass, CATV, WAN (Wide area networks), LAN (local area networks), and ISDN (integrated systems digital network). However, this Agreement does not apply to new construction nor to retrofits in those locals where the Inside Local Union has control of the work.

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

*The Jumping Modifier.* NEAP would read the word "outside" to leapfrog "plant" and mod-
ify the word "telephone." (It fails to explain how the word acquired its gymnastic skills.) Such a
reading would look like this (additions underlined; deletions struck):

> This Agreement . . . covers . . . maintenance and removal of teledata facilities
> (voice, data and video) including outside ~~plant,~~ telephone ~~and data inside wire~~
> <u>work</u>, . . ., fiber optic cable and equipment, . . . ., and ISDN (integrated systems
> digital network).

Contract interpretation usually does not involve cherry-picking which words in a sentence have
meaning.

*The Series Qualifier.* Even putting NEAP's basic premise on surer textual footing produces
wonky results. Sometimes an adjective that precedes a list modifies every item in the list. Antonin
Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012). Using
this tool, "outside" would logically modify everything in the national agreement's parallel list—
from "plant" to "ISDN (integrated systems digital network)." *See* Chicago Manual of Style ¶ 6.19
(17th ed. 2017) (discussing the use of serial commas). Take a look:

> This Agreement . . . covers . . . maintenance and removal of teledata facilities
> (voice, data and video) including outside plant, <u>outside</u> telephone and data inside
> wire, <u>outside</u> interconnect, <u>outside</u> terminal equipment, <u>outside</u> central offices, <u>out-
> side</u> PABX, <u>outside</u> fiber optic cable and equipment, <u>outside</u> railroad communica-
> tions, <u>outside</u> micro waves, <u>outside</u> V-SAT, <u>outside</u> by-pass, <u>outside</u> CATV, <u>out-
> side</u> WAN (Wide area networks), <u>outside</u> LAN (local area networks), and <u>outside</u>
> ISDN (integrated systems digital network).

Grammatically realistic. But this leads to two new problems for NEAP.

First, "telephone" is not a stand-alone item in the list. So applying "outside" as a series
qualifier would still not produce "outside telephone [work]" as an item in the list. Instead, it would
produce "outside telephone and data inside wire [work]." Second, even if we split up "telephone"
from "data inside wire," the reading still would not make sense. Consider an "outside data inside

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

wire" or "outside central offices."  In short, NEAP's attempts to undercut H&M's interpretation are unpersuasive.

B.

The majority takes a different approach than NEAP.  It reasons that, because the second 2011 memorandum does not make the meaning of an undefined critical term "immediately clear," it must resort to extrinsic evidence.  Maj. Op. 15.  But courts should try their best to determine the intent of the parties by looking at "the language they chose."  *E.g.*, *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 768 (6th Cir. 2014); *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003).  Liberated from the constraints of that language, the majority identifies two alternative interpretations.

*The Vanishing Conjunction.*  The majority's first interpretation supports NEAP's conclusion that outside telephone work has a special exclusion for fiber-optic cable and equipment. Where does it find this exclusion?  Like NEAP, the majority points to the national agreement's listed items and relies on the canon against superfluity.  *See Nat'l Air Traffic Controllers Ass'n*, 654 F.3d at 658–59.  But the majority seems to (correctly) concede that "outside telephone work" is *not* listed in that agreement.  So what item in the list does it rely on?  "Telephone."  Maj. Op. 18.

But as I pointed out above, "telephone" is not a stand-alone item in the list (or a "semantic unit[]," in the majority's words).  It is attached to "data inside wire" by the coordinating conjunction "and."  The full item is "telephone and data inside wire," which we should presume has a distinct meaning (in all likelihood, telecommunications wires installed inside).

What to do about the conjunction?  The most aggressive option would be to ignore "and data inside wire" altogether.  The only other option is to treat "and" as just another comma, so that

- 37 -

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

"telephone" and "data inside wire" are separate items in the list. But this either exposes an inconsistency or creates a *new* superfluity problem.

It is inconsistent to read the "and" as a comma because the majority recognizes that this same conjunction holds together another item in the list: "fiber optic cable *and equipment*." Maj. Op. 18 (emphasis added). Nor could one remedy the problem by treating all "ands" alike. Take a peek at how that would look:

> This Agreement . . . covers . . . telephone, ~~and~~ data inside wire, interconnect, terminal equipment, . . ., fiber optic cable, ~~and~~ equipment, . . . ISDN (integrated systems digital network).

This treatment leaves "fiber optic cable" and "equipment" as separate items in the list. But now, "terminal equipment" is rendered superfluous by the more general "equipment." *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) ("[T]he canon against surplusage assists only where a competing interpretation gives effect to every clause and word of a statute." (cleaned up)). So this approach provides no reprieve from the contract's plain language.

In short, the majority's newly discovered reading is less plausible than H&M's common-sense reading (that "outside telephone work" means telephone work performed outside). Thus, the common-sense reading should control.

*The Domino Effect.* The majority then offers a second interpretation that it admits would shock even the parties. Maj. Op. 25. That's a problem: A contract is supposed to reflect the parties' intent, not shock them. So it is hard to see why the majority proceeds down this path.

Undeterred, the majority contends that outside telephone work might include *everything* the outside local unions do. Maj. Op. 17, 25, 30. But by this logic, it explains, the parties would have imposed an obligation on H&M to send significant funds every month to NEAP in 2011; only to rescind that obligation in its entirety that same year (by excluding payment for outside

No. 20-1024, *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*

telephone work); only to impose it all over again in 2014 (by increasing contributions to NEAP by one-half of one percent).  All this by tinkering with the types of labor that require H&M to make contributions to NEAP.  *See* Maj. Op. 25–26.  Contracting parties do not usually work such substantial changes through such minor tweaks.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The majority acknowledges that these consequences would *not* accord with how the parties expected the contracts to work—ordinarily the touchstone of contract interpretation.  *See* Maj. Op. 25.  Even NEAP, the beneficiary of this interpretation, says that this "cannot be what the parties intended."  Reply Br. 5.  After all, if the goal of the second 2011 memorandum was to eliminate any contribution obligation, why not just say "that contributions to NEAP were not required for any work performed under the [national] agreement?"  Appellant Br. 18.  Exactly right.

\* \* \*

The district court gave the contract the best reading.  So should we.  Because I would affirm the district court's decision below in full, I respectfully dissent.