**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

NATIONAL ELECTRICAL ANNUITY PLAN,

     Plaintiff,

v.                                    Case No. 18-13701

HENKELS AND MCCOY, INC.,

     Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT AND
GRANTING DEFENDANT'S MOTION FOR JUDGMENT**

In an amended complaint filed January 31, 2019, Plaintiff National Electrical

Annuity Plan ("NEAP") alleges that Defendant Henkels and McCoy, Inc. ("H&M") failed

to make required Employee Retirement Income Security Act ("ERISA") contributions

pursuant to the terms of the parties' collective bargaining agreement. (ECF No. 10.)

NEAP requests contributions for work performed for Verizon related to the installation of

equipment and fibers to support a 5G network. H&M counters that it is not obligated to

make the contributions.

In lieu of a bench trial, the parties agreed to a trial on the papers, wherein the

court will resolve the ultimate issue of whether the relevant collective bargaining

documents obligate H&M to make contributions for work performed on the Verizon

project and the related issue of attorney fees and costs. (ECF No. 54.) The parties'

respective motions for judgment have been fully briefed and reviewed. For the reasons

stated below, the court will deny NEAP's motion for judgment and will grant H&M's

motion.

# I. STANDARD

A trial on the papers requires the court to "find the facts specially and state its conclusions of law separately." FED. R. CIV. P. 52(1)(a)(1). Those factual findings and legal conclusions are accordingly set forth below.

However, the unique posture of this case should be noted at the outset. The court considered the issues at bar when resolving the parties' cross-motions for summary judgment, albeit under a different standard of review. (*See* Opinion and Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment, ECF No. 39.)[1] The same two issues of contract interpretation are now the subject of the cross-motions at bar: (1) whether the work for which NEAP seeks contribution constitutes "outside telephone work" within the meaning of the second memorandum of understanding from 2011 ("2011 MOU II"); and (2) whether the 2011 MOU II's limitation on contributions for "outside telephone work" remains in effect. As a fact question, the first issue will be addressed as part of the court's factual findings. As a question of law, and because the first issue informs its resolution, the second issue will be addressed as part of the court's legal conclusions.

# II. FINDINGS OF FACT

Very limited factual disputes remain in this case. As such, the court will first articulate the undisputed facts and relevant procedural history to provide background before determining the meaning of "outside telephone work."

---

[1] For reasons explained more thoroughly below, the court's decision was appealed and ultimately remanded by the Sixth Circuit. *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*, 846 F. App'x 332, 333 (6th Cir. 2021).

**A. Stipulated Facts**

As part of their agreement to a trial on the papers, the parties submitted a Joint Statement of Undisputed Facts ("Joint Statement"). (ECF No. 55.) Due to the joint nature of the statement, the court adopts it as part of its factual findings, excerpting it below[2]:

## A. The Parties

**1.** Plaintiff National Electrical Annuity Plan ("NEAP") is a trust fund established under, and administered pursuant to, Section 302 of the LaborManagement Relations Act, of 1947, as amended ("LMRA"), 29 U.S.C. §186, and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §1001, et seq., with principal offices located in Rockville, Maryland.

**2.** Defendant, Henkels & McCoy, Inc. ("H&M"), is a Pennsylvania corporation, certified to do business in the State of Michigan.

## B. The Teledata Agreement

**3.** In 1995, the [International Brotherhood of Electrical Workers ("IBEW")] and H&M entered into the Teledata Agreement.

**4.** The "Scope" of the Teledata Agreement states that it covers:

> low voltage construction, installation, maintenance and removal of teledata facilities (voice, data and video) including outside plant, telephone and data inside wire, interconnect, terminal equipment, central offices, PABX, fiber optic cable and equipment, railroad communications, micro waves, V-SAT, by-pass, CATV, WAN (Wide area networks), LAN (local area networks), and ISDN (integrated systems digital network).

**5.** Section 1.01 of the Teledata Agreement provides:

---

[2] For ease of reading, the statement's internal citations to the record have been omitted.

This Agreement shall take effect March 1, 1995 and shall remain in effect until February 28, 1996, unless otherwise specifically provided for herein. It shall continue in effect from year to year thereafter, from March 1 through February 28 of each year, unless changed or terminated in the way later provided here.

**6.** Section 1.02 of the Teledata Agreement provides:

Section 1.02 (a) Either party desiring to change or terminate this Agreement must notify the other, in writing, at least 90 days prior to the anniversary date. (b) Whenever notice is given for changes, the nature of the changes desired must be specified in the notice. (c) The existing provisions of the Agreement shall remain in full force and effect until a conclusion is reached in the matter of proposed changes. (d) Notice by either party of a desire to terminate this Agreement shall be handled in the same manner as a proposed change.

**7.** The Teledata Agreement has not been terminated pursuant to Section 1.02,

and it therefore remains in effect.

**8.** The Teledata Agreement acknowledges that the parties might make changes

to the agreement, but expressly states in Section 1.03:

…Any such change or supplement agreed upon shall be reduced to writing, signed by the parties hereto, and submitted to the International Office of the IBEW for approval, the same as this Agreement.

## C. The 2011 Appendix

**9.** H&M has also entered into supplements to the Teledata Agreement with IBEW

local unions, namely, Local Union No. 17 ("Local 17") and Local Union No. 876

("Local 876"). Together, Local 17 and Local 876 comprise the "Local Unions".

**10.** In early 2011, the Local Unions and H&M signed an Appendix to the Teledata

Agreement (the "2011 Appendix").

**11.** The 2011 Appendix is one of several separate documents that modifies the

Teledata Agreement for work done within Michigan, a similar process that occurs

with respect to other locals nationwide.

4

**12.** The 2011 Appendix was to be effective from November 29, 2010 through

November 27, 2011 and continue on a year-to-year basis unless changed or

terminated. It states as follows:

> EFFECTIVE DATE FOR APPENDIXES
>
> These Appendixes shall take effect November 29, 2010 and shall remain
> in effect until November 27, 2011, unless otherwise specifically provided
> for herein. It shall continue in effect from year to year thereafter, from
> November 29 through November 27 of each year unless changed or
> terminated in the way later provided herein. (A) Either party desiring to
> change or terminate these Appendixes must notify the other, in writing, at
> least 90 days prior to the anniversary date. (B) Whenever notice is given
> for changes, the nature of the changes desired must be specified in the
> notice. (C) The existing provisions of the Appendixes shall remain in full
> force and effect until a conclusion is reached in the matter of proposed
> changes. (D) Notice by either party of a desire to terminate these
> Appendixes shall be handled in the same manner as a proposed change.

**13.** Section 5.07 of the 2011 Appendix addresses contributions to NEAP, stating

that the Employer will contribute to the NEAP at the rate of 16.5 percent of the

gross monthly labor payroll. It also contains provision for a 401(k) plan.

## D. The 2011 MOU I and 2011 MOU II

**14.** A few months after signing the 2011 Appendix, H&M, Local 17, and Local

876 signed two memoranda of understanding. The first memorandum, which is

referred to in the Amended Complaint as "2011 MOU I," is an addendum to the

Agreement, which is defined to include Appendices to the Teledata Agreement

"and all successor Agreements." The 2011 MOU I states, in part:

> This [MOU], executed between Henkels & McCoy, Inc., hereinafter
> referred to as "Employer", and IBEW Locals 17 & 876, hereinafter referred
> to as "Unions", shall serve as an addendum to the Teledata Agreement,
> hereafter referred to as the "Agreement", between Employer and Union
> (which Agreement is in the form of Appendices to the National Teledata
> Agreement between Employer and the IBEW International), and all
> successor Agreements...

5

The only substantive change to the Agreement contained in the 2011 MOU I is

an increase in the wage rate. The 2011 MOU I also extends the "Agreement"

three years, or until November 23, 2014.

**15.** A second memorandum of understanding, referred to in the Amended

Complaint as the "2011 MOU II" also serves as an addendum to the Teledata

Agreement, its appendices, "and all successor agreements":

> This [MOU], executed between Henkels & McCoy, Inc., hereinafter
> referred to as "Employer", and IBEW Locals 17 & 876, hereinafter referred
> to as "Union", shall serve as an addendum to the Teledata Agreement,
> hereafter referred to as the "Agreement", between Employer and Union
> (which Agreement is in the form of Appendices to the National Teledata
> Agreement between Employer and the IBEW International), and all
> successor Agreements.

It states that H&M is not required to make any contributions to the NEAP for "all

outside telephone work":

> It is agreed and understood that for all outside telephone work performed
> by Employer: 1) Employer shall not be required to make any contributions
> to the National Electrical Annuity Plan. 2) The wages shall be ninety one
> per cent (91%) of the wage rates of all classifications contained in the
> aforementioned Agreements and all successor Agreements. ***

The 2011 MOU II also provided:

> 4) In the event of any conflict between the provisions of this MOU and the
> provisions of the aforementioned Agreement, the provisions of this MOU
> shall prevail and take precedence.

2011 MOU II does not contain any durational limitation.

**16.** The 2011 MOU II was negotiated by Keith Sarns, Business Manager of Local

876, IBEW; Stephen Freind, Vice President and Director of Labor Relations of

H&M; and Clint Grassmick, Area Director for the Central Region of H&M.

Although Kevin Shaffer of Local 17, IBEW signed 2011 MOU II, he did not

participate in its negotiation. Sue Gannon from H&M testified that, without going back and looking, she couldn't tell who drafted 2011 MOU II, but stated that "[i]t's most likely I did, but there are occasions that Steve [Freind] drafted some."

**17.** Steve Freind testified regarding what led to the negotiation of the 2011 MOU II. He stated that beginning around 1999, the market was facing "nonunion competition in areas where [H&M] never faced it before." In order to remain an IBEW contractor, "there were a number of concessions that we needed from the unions," including removing the provision for NEAP contributions and allowing H&M to pay only 91% of the listed wage rates. Freind explained that Local 876 did not want to put the NEAP exclusion in the body of the agreement, but instead agreed to put it in the separate 2011 MOU II. The 2011 MOU II, in turn "was amending and being a part of that agreement … and all successor agreements."

**18.** Freind could not recall what projects H&M was working on when 2011 MOU II was negotiated.

**19.** Shaffer testified that he spoke to Keith Sarns of Local 876 who stated that 2011 MOU II only was intended to apply to landline type of work.[3]

**20.** The term "outside telephone work" is not expressly defined in any of the collectively bargained documents or in any other document.

---

[3] The court previously noted that this "fact" is clearly hearsay and accordingly did not consider it as part of its summary judgment ruling. (*See* ECF No. 39.) It is unclear whether the parties are waiving any objection on hearsay grounds by including this portion of Mr. Shaffer's testimony. However, because the parties have presented the statement jointly, the court will operate under the assumption that no such objection exists.

**21.** Grassmick does not recall any discussions during the negotiations for 2011 MOU II regarding what was to be considered "outside telephone work."

**22.** Freind testified that "the general terminology was, outside telephone work is anything, communications performed outside."

**23.** According to Gary Smith, in his 30 years of experience working in the industry with the IBEW, as well as in his dealings with Local 17 and Local 876, "fiber optic cable placement has always been considered outside telephone work and completed under the Tele-Data agreement." Additionally, according to H&M's Director of Central Telecom Jon Joynson, H&M has "been laying fiber optic cable since the late '80s." IBEW Local 17 Business Manager Kevin Shaffer admitted that telephone calls can be transmitted over fiber optic lines.

**24.** Local 17 and Local 876 are outside locals. When work is to be done inside a building, it is done by individuals represented by inside IBEW Locals. The work currently being done by H&M for Verizon is outside the building to the demarcation point.

**25.** Local 17 Assistant Business Manager Mitchell confirmed that fiber optic lines existed in 2011 and are not "new technology."

**26.** H&M has used the same general construction methodologies to install fiber optic cables since the 1980s:

> Q.    What about the fiberoptic cable? Has the construction methodologies remained the same for laying fiberoptic cable?
> A.    Yes. I've been doing this 34 years and the only machinery that has been added has been directional boring, and that was in the late '80s, early '90s, and we're digging holes, putting in pipe and putting cable in it, and nothing's changed since that time.
> Q.    So the process that was used in the '80s to lay fiberoptic cable is the same process?

A.    Same process.

Joynson testified that while the manner in which the client is using the fiber optic cables may have changed, the technology and construction methods H&M has used to install those cables has remained the same. In other words, H&M was installing a cable in 2011 and a cable in 2018.

**27.** Freind testified that if contributions were made to NEAP for "outside telephone work" after the 2011 MOU II was signed, it was an administrative error.

## E. The 2014 MOU

**28.** The Local Unions and H&M agreed to extend the 2011 Appendix for two years to November 20, 2016 through another Memorandum of Understanding (the "2014 MOU")[.] The 2014 MOU was signed by H&M on January 9, 2015; by Local 876 on December 16, 2014; and by Local 17 on December 22, 2014. The agreement was negotiated between Stephen Freind and Hank Matulewicz of Local 876. Freind could not recall discussing the 2011 MOU II with Hank Matulewicz in 2014.

**29.** Although Dean Bradley, Business Manager of Local 17, IBEW, signed the agreement, he did not participate in its negotiations.

## F. The 2017 Appendix

**30.** In 2017, the Local Unions and H&M signed another Appendix to the Teledata Agreement, which became effective November 21, 2016, but was executed in 2017 ("2017 Appendix"). In Section 5.07 of this Appendix, the parties agreed to contribute to NEAP an amount equal to 17% of payroll the first year of the agreement and to 18% effective November 24, 2017 of "gross monthly payroll."

9

**31.** The 2017 Appendix was effective "until November 25, 2018, unless otherwise specifically provided herein." The 2017 Appendix automatically renews unless a party seeking to modify or terminate the Appendix provides timely, detailed notice regarding the nature of the changes desired.

**32.** The 2017 Appendix does not mention the 2011 MOU II.

**33.** The 2017 Appendix does not contain an integration clause purporting to supersede prior agreements. The 2011 MOU II was not discussed during negotiations.

**34.** Although the 2017 Appendix was signed by Chad Clark for Local 876 and Dean Bradley for Local 17, neither participated in the negotiations.

### G. Additional Facts Regarding Bargaining History

**35.** In January, 2018, the parties negotiated and signed two Memorandum of Understandings, dealing with the issues of portability and jurisdiction of the Local Unions over Verizon work, which were addendums to the Teledata Agreement. Local 17 Assistant Business Manager Mitchell did not participate in the negotiation of the 2018 MOUs. He testified that in order for either party to eliminate these MOUs, that party would have to negotiate for the elimination of the MOU:

> Q.   Now if a party wanted to eliminate one of these MOUs, what would they have to do?
> A.   You would have to negotiate it out.

**36.** Local 17 Business Manager Dean Bradley testified that it was Local 17's practice to put proposals to eliminate provisions of contracts in writing:

> Q.   What is Local 17's practice with respect to proposals; is it provided in writing, orally?

10

A.    Typically in writing.
Q.    So if someone wants to add something to a contract, would they normally provide a proposal in writing, you know, we want to add no subcontracting language or something like that; you'd put that in writing?
A.    Typically, yes.
Q.    How about if you were going to remove something from a contract; would you put a proposal to remove certain language from a contract in writing?
A.    Typically, yes.

**37.** Bradley also testified that a party seeking to modify a collectively bargained provision must provide at least 90 [days'] notice prior to the anniversary date of the contract. Bradley stated that Local 17's practice is to send letters regarding its intent to negotiate changes to the bargaining agreements.

**38.** Since 2011, Local 17 has never submitted a letter of intent to modify the collectively bargained documents. Instead, each time such a letter was sent, it was sent by Local 876.

**39.** Neither Local Union has ever sent a proposal to amend, modify, or terminate the 2011 MOU II. Local 17 Business Manager Bradley confirmed that prior to negotiating the current appendix, the unions did not send a notice of intent to modify, amend, or terminate the 2011 MOU II and that it was not even discussed during negotiations.

**40.** According to Gary Smith, the "NEAP's position or statement that the MOU II has not been in effect since, at the latest, November 21, 2016 when a new Appendix was signed, violates the Union's very own long standing position that no agreement or part of an agreement expires or is canceled unless in writing and approved by all parties."

**H. Recent Events**

    **41.** Mitchell and Bradley testified that they were not personally aware of the existence of 2011 MOU II prior to October 2018. Both assert that the first time they had personal knowledge of the 2011 MOU II was when they received a copy from H&M in October 2018.

    **42.** After Bradley and Mitchell became aware of the 2011 MOU II, on October 31, 2018, they contacted counsel and drafted a letter stating their position that the 2011 MOU II was no longer in effect. Bradley admitted that this letter was not sent 90 days prior to the anniversary date of the contracts.

    **43.** Freind, who negotiated each collectively bargained agreement between H&M and Locals 17 and 876, including the 2011 MOU II, responded. Freind explained that Bradley's belief about the MOU was not correct since it applied to "all successor agreements."

    **44.** On November 27, 2018, Plaintiff filed this lawsuit. On January 16, 2019, H&M filed a motion to dismiss.

    **45.** On January 22, 2019, the Local Unions sent a letter regarding termination of 2011 MOU II. On May 22, 2019, H&M responded, explaining in detail why the 2011 MOU II remains in effect.

    **46.** Bradley and Mitchell confirmed that Local 17 maintained copies of the 2011 MOU II in its files. Mitchell testified that while he "sometimes" reviews the relevant collectively bargained documents prior to negotiations, with respect to negotiations with H&M he "didn't go backwards to see what they did in the past."

**47.** Mitchell initially testified that he only personally had "the last five years of files" related to H&M and that older files were "in storage." Mitchell later admitted that "storage" meant that the files were on a different floor in Local 17's headquarters. It took him a half hour to find a copy of the 2011 MOU II in Local 17's files once he went to look for it in response to a subpoena served in this lawsuit.

**[I.] Complaint Allegations**

**48.** According to Plaintiff, the work that H&M is performing is "the installation of a 5G network … in various locations within the geographic jurisdiction of Local 17, which includes the installation of MCI small cell equipment and overhead and underground fiber." Plaintiffs do not allege that this work is being performed inside. This work, which is for Verizon, is also described as consisting of over 1,500 miles "of aerial and underground fiber optic cable and conduit construction."

**49.** Director of Central Telecom Jon Joynson, who oversees the project, explained that H&M installs the cable up to a demarcation point, and that all of the work performed is "outside the building." Joynson explained that when H&M bid on the Verizon project, it did so with the understanding that the 2011 MOU II and its associated cost structure, remained in effect.

(Joint Statement of Undisputed Facts, ECF No. 55.)

## B. COURT'S FINDINGS

The court makes the additional factual findings below, cognizant that the primary factual dispute in this case is the meaning of the term "outside telephone work." By way

13

of background, it should be noted that the term "outside telephone work," as used in the 2011 MOU II, is ambiguous. *Nat'l Elec. Annuity Plan v. Henkels & McCoy, Inc.*, 846 F. App'x 332, 333 (6th Cir. 2021). As the trier of fact, the court must resolve this ambiguity by determining what "outside telephone work" means. The meaning and scope of the term inform whether the 2011 MOU II is still in effect and, by extension, resolution of this case as whole.

The parties dispute the meaning of the term "outside telephone work," and more specifically whether it encompasses the installation of fiber optic cables—the work H&M performed for the Verizon project at issue. NEAP makes two arguments on this point. (ECF No. 57.) First, NEAP argues that "outside telephone work" encompasses all the work the Local Unions perform under the Teledata Agreement, including the installation of fiber optic cables. (ECF No. 57, PageID.1399–1401.) As support for its first argument, NEAP relies on the following: testimony from Stephen Friend regarding general terminology and the purpose of the 2011 MOU II being to get rid of NEAP contributions altogether (JS ¶ 22; R 30-4, PageID.400–01); testimony from Gary Smith that fiber optic installation was always considered outside telephone work (JS ¶ 23); and the Sixth Circuit's indication that a reasonable trier of fact could find such a meaning based on the record. *Nat'l Elec. Annuity Plan*, 846 F. App'x at 342–45.

Second, NEAP argues in the alternative that "outside telephone work" does not include the installation of fiber optic cables. (ECF No. 57, PageID.1402.) As support for its second argument, NEAP relies on H&M's contribution record following the negotiation of the 2011 MOU II, wherein H&M continued to pay contributions between 2012 and 2016 totaling $511,537.64 and only failed to pay for six months' worth of

contributions on a single project totaling $18,114.75. (ECF No. 57, PageID.1402–04.)

NEAP further criticizes H&M's explanation that the payments made were an

administrative error, relying again on the Sixth Circuit's skepticim, *Nat'l Elec. Annuity*

*Plan*, 846 F. App'x at 345, while also invoking the doctrine of *contra proferentem* due to

H&M's strong bargaining position with respect to knowledge of and desire for the

contribution exception. (Id.) As additional support, NEAP provides the following

documentary evidence: the Second Supplemental Affidavit of Charles Nichols (ECF No.

58); and the Affidavit of Michael Kozlowski (ECF No. 59).

H&M makes the single, overarching argument that "outside telephone work"

includes the installation of fiber optic cables but does not encompass all the work the

Local Unions do under the Teledata Agreement. (ECF No. 61, PageID.1495–1500.) In

making that argument, H&M offers nine sub-arguments, which can be summarized as

follows: (1) H&M appropriately made 16.5% NEAP contributions for several projects

involving "inside" work, which are examples of non-"outside telephone work" performed

under the Teledata Agreement; (2) basic rules of contract interpretation require "outside

telephone work" to be construed as not covering all the work performed under the

Teledata Agreement because a contrary interpretation would render the words "outside

telephone" otherwise superfluous, *CHS/Cmty. Health Sys., Inc. v. Ledford*, 204 F. Supp.

3d 983, 988 (M.D. Tenn. 2016) (quoting *Tabernacle–The New Testament Church v.*

*State Farm Fire & Cas. Co.*, 616 F. App'x 802, 808 (6th Cir. June 22, 2015)); (3)

customary and trade usage reflects that the terms "telephone" and "fiber optics" are

used interchangeably; (4) it is undisputed that the Verizon project work is performed

outside; (5) whether pre-existing or advanced technology is being installed on the

Verizon project is irrelevant to the question of whether fiber optic cable installation is "outside telephone work;" (6) the 2011 MOU II does not limit "outside telephone work" to "copper wire" telecommunications; (7) the challenged work is being performed under the Michigan Metropolitan Extension Telecommunications Right-of-Way Oversight Act, MCL 484.3101, *et seq.*, which contains certain definitions suggesting that "fiber optic cables" are synonymous with "telecommunications;" (8) H&M's past, erroneous contributions do not constitute an unequivocal waiver of its rights under the 2011 MOU II; and finally (9) the doctrine of *contra proferentem* is inapplicable to contracts produced through collective-bargaining between sophisticated parties, *Courson v. Bert Bell NFL Player Ret. Plan*, 75 F. Supp. 2d 424, 432 (W.D. Pa. 1999), aff'd, 214 F.3d 136 (3d Cir. 2000); *Baptist Mem'l Hosp. v. Marsaw*, 13 F. Supp. 2d 696, 702–03 (W.D. Tenn. 1998), aff'd, 208 F.3d 212 (6th Cir. 2000). (ECF No. 61, PageID.1495–1500.)

As support, H&M provides the following documentary evidence: Declaration of Stephen Friend (ECF No. 61-2); Declaration of Jon Joynson (ECF No. 61-3); Declaration of Victoria Epifanio-Angelucci (ECF No. 61-4); H&M's 4th Supplemental Response to Document Request No. 2 (ECF No. 61-5); a Highlighted Payroll Chart (ECF No. 61-6); Declaration of William Henderson (ECF No. 61-7); and Declaration of Beth Suchsland (ECF No. 61-8).

The court has reviewed the parties' arguments and supporting documentary evidence, finding that:

**J. The Definition of Outside Telephone Work**

**50.** As used in the 2011 MOU II, the term "outside telephone work" includes the installation of fiber optic cables, that is, the work H&M performed for the Verizon

16

project.[4]

**51.** Moreover, the scope of the activities encompassed by the term "outside telephone work" does **not** include all work that H&M performs under the Teledata Agreement.[5]

**52.** When read collectively, these agreements are harmonious only if "outside telephone work" is a distinct concept from the 1995 Teledata Agreement scope section.

**53.** Furthermore, it is significant that "outside telephone work" appears as a distinct concept for the first time in the 2011 MOU II.

**54.** Given the parties' intent surrounding the negotiations of the 2011 MOU II, specifically Stephen Friend's declaration "that term was intended to cover all work performed outside that was done under the Teledata Agreement" (ECF No. 61-2, PageID.1511) and even Keith Sarne's statements that only landline work was contemplated (JS ¶ 19), it is appropriate to conclude that work envisioned as "outside telephone work" would not include all possible activities under the 1995 Teledata Agreement.

---

[4] In making this finding, the court relies on: (1) the collective testimonies of Stephen Friend (JS ¶ 22), Gary Smith (JS ¶ 23), and Jon Johnson (JS ¶ 26); (2) the undisputed fact that work performed by H&M on the Verizon project was physically done outside; and (3) the very nature of the work being done, that is, the installation of fiber optic cables to create a 5G network for one of the nation's largest telephone providers (JS ¶ 48).

[5] In making this finding, the court primarily considers the scope section of the 1995 Teledata Agreement, noting that "outside telephone work" does not appear as a specific activity (JS ¶ 4), and the plain language of the 2011 MOU II, the 2014 MOU, and the 2017 Appendix.

**55.** Ideally, as this interpretation favors it, H&M should have provided the court with an example of work which would be covered broadly by the Teledata Agrement while not subject to the 2011 MOU II exclusion.

**56.** Indeed, H&M even purports to do so, submitting a Highlighted Payroll Chart (ECF No. 61-6) and the Declaration of William Henderson (ECF No. 61-7) that list and briefly describe certain "inside" projects.

**57.** However, as NEAP correctly points out in its response, the parties already stipulated that "inside" work under the Teledata Agreement is performed by other "inside" locals. JS ¶ 24.

**58.** Without more information, such as an explanation from H&M as to why these "inside" projects are permitted to be done by outside Locals 17 and 876, the court cannot rely on these "inside" projects as an example of work done under the Teledata Agreement generally.

**59.** Even so, this is not fatal to H&M's position.

**60.** Given the reasons for negotiating the 2011 MOU II contribution exclusion provision, namely to combat increased competition (ECF No. 30-4, PageID.401), and Jon Joyson's explanation as to why he bid on the Verizon project (ECF No. 61-3, PageID.1521), namely because it was understood to be "outside telephone work," it does not surprise the court that H&M would exclusively seek out projects that are only "outside telephone work" in kind.

**61.** While H&M can certainly bid for projects that are considered non-"outside work activities," nothing in the language of their various agreements with the Local Unions requires them to do so.

**62.** Naturally, however, this raises the question, "Why raise the contribution percentage twice more in 2014 and 2017 respectively, if there are no projects for which the contributions would be paid?"

**63.** To answer this, the court again returns its attention to the list of activities under the scope section of 1995 Teledata Agreement. JS ¶ 4.

**64.** Though not argued by the parties, based on the court's understanding of the term "outside telephone work," it would stand to reason that "railroad communications" is an activity that would fall outside the scope of the term "outside telephone work."[6]

**65.** The court readily acknowledges that, at first blush, H&M's contribution record following the 2011 MOU II negotiations is troubling, especially when one considers the concessions H&M gained.

**66.** However, it is a basic principle of contract law that a party does not automatically lose a contractual right simply by failing to regularly exercise it.

**67.** This is especially true where, as here, the parties clearly delineated how to change or rescind portions of their agreement. JS ¶¶ 6, 8.

**68.** On this point, it is of further significance to the court that the Local Union negotiators were not even aware of the 2011 MOU II when negotiating the 2017 Appendix and that, **<u>after</u>** suit was filed, the Local Unions sought to negotiate out

---

[6] The court is aware that H&M lists projects involving the railroad company Amtrak in its Highlighted Payroll Chart. (ECF No. 61-6.) However, because the court has no detailed information regarding the nature of that project beyond its title, and perhaps more importantly because it is not the subject of the present litigation, the court's finding should not be construed as making a determination that the Amtrak projects are not "outside telephone work."

the 2011 MOU II, according to the Joint Statement of facts and the Declaration of

Beth Suchsland, the lead negotiator for H&M. JS ¶ 40; JS ¶ 45; ECF 61-8,

PageID 1641.

**69.** Additionally, the court further finds credible H&M's explanation that an

administrative error was made in light of the Declaration of Victoria Epifanio-

Angelucci, H&M's Union Benefits Supervisor, which in part states:

> It is not unusual for the incorrect wage rates and fringe benefit
> contributions to be paid. It happens from time-to-time because H&M does
> not regularly review the wage rates and contributions rates to ensure that
> the appropriate rate was selected for the work performed. Additionally,
> due to regular turnover, the staff overseeing the payroll might not catch
> the error. Finally, as noted above, a worker, the union, and the fringe
> benefit fund might not alert H&M to the error because it benefits the
> worker.

ECF 61-4, PageID.1562.

### III. CONCLUSIONS OF LAW

The applicable law for interpreting collective-bargaining agreements is again

undisputed. Ordinary principles of contract law govern collective bargaining

agreements. *See M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (citing

*Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456–57 (1957)). Courts look "first

to the [collective bargaining agreement's] explicit language for clear manifestations of

the parties' intent," and interpret the agreement as "'part of an integrated whole'

meaning that, wherever possible, 'each provision is construed consistently with the

entire document and the relative positions and purposes of the parties.'" *Id.* (quoting *Int'l

Union v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983)).

As previously mentioned, the Sixth Circuit determined that the contractual term

"outside telephone work," as used by the parties is ambiguous. *Nat'l Elec. Annuity Plan*,

20

846 F. App'x at 333. The court, as the trier of fact, has now definitively concluded that "outside telephone work" encompasses the work done for the Verizon project, that is, the installation of fiber optic cables to create a 5G network, but not all work that H&M can perform under the Teledata Agreement. The disputed legal question remaining before the court is whether the contribution exclusion provision within the 2011 MOU II is still effective in light of the NEAP contribution provisions contained in the 2017 Appendix. The court concludes that it is. Specifically, in light of the limited scope of "outside telephone work," the terms of 2011 MOU II and 2017 Appendix are not in conflict. Since the 2011 MOU II exclusionary provision is effective, judgment for H&M is appropriate. *See Nat'l Elec. Annuity Plan*, 846 F. App'x at 346-47 ("But because fiber optics would fall within the ambit of 'outside telephone work,' the work at issue in this case would be subject to the contribution exclusion, and H & M would have no obligation to contribute for that work. Thus, H & M would be entitled to judgment.").

Finally, the last issue for the court to decide is whether to award attorney fees and costs under 29 U.S.C. § 1132(g). In relevant part, the statute provides that, "(1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." In light of the procedural history in this case, and the fact that appellate guidance was necessary for its resolution, the court is not inclined to award H&M attorney fees and costs. Because judgment in this case favors H&M, the court is not mandated under 29 U.S.C. § 1132(g)(2) to award NEAP attorney fees and costs.

## VI. CONCLUSION

For the reasons explained above, the 2011 MOU II remains in effect and governs the type of work for which H&M must make contributions. The work at issue falls within the meaning of "outside telephone work" for which H&M had no contractual obligation to contribute. Accordingly,

IT IS ORDERED that NEAP's motion for judgment (ECF No. 57) is DENIED and H&M's motion for judgment (ECF No. 61) is GRANTED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  September 29, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 29, 2022, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\EKL\Opinions & Orders\Civil\18-13701.NATIONALELECTRICAL.Opinion&OrderTrialOnThePapers.EKL.docx